**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1850

JESUS HUMBERTO ZUNIGA ROMERO,

        Petitioner,

   v.

WILLIAM P. BARR, Attorney General,

        Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: May 8, 2019                        Decided: August 29, 2019

Before AGEE, FLOYD, and THACKER, Circuit Judges.

Petition for review granted by published opinion. Judge Agee wrote the opinion, in which Judge Floyd and Judge Thacker joined.

**ARGUED:** Benjamin Ross Winograd, IMMIGRANT & REFUGEE APPELLATE CENTER, LLC, Alexandria, Virginia, for Petitioner. Rebecca Hoffberg Phillips, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Georgeanna M. Gardner, GARDNER LAW, PLLC, Raleigh, North Carolina, for Petitioner. Joseph H. Hunt, Assistant Attorney General, John S. Hogan, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

AGEE, Circuit Judge:

After an immigration judge ("IJ") denied Jesus Zuniga Romero's request for administrative closure of his case—which would have removed it from the IJ's active docket pending the completion of a separate immigration proceeding—Romero petitioned the Board of Immigration Appeals ("BIA") for review. Although the BIA initially sustained Romero's appeal and administratively closed his case, it later dismissed the appeal after a precedential decision issued by the Attorney General in *Matter of Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018). In *Castro-Tum*, the Attorney General concluded that IJs and the BIA do not have the general authority to administratively close cases. Romero now brings a petition for review of the BIA's decision to this Court. For the reasons we discuss below, we grant Romero's petition for review, vacate the BIA's decision, and remand for proceedings consistent with this opinion.

I.

In 2013, the Department of Homeland Security ("DHS") commenced removal proceedings against Romero, a citizen of Honduras, for being present in the United States without being admitted or paroled. *See* 8 U.S.C. § 1182(a)(9)(B)(ii). Although Romero accepted a grant of voluntary departure at a hearing before an IJ in 2014, he subsequently sought and received reopening of his case after the IJ determined that Romero was the

beneficiary of a pending Form I-130[1] filed by his wife, who was then a lawful permanent resident ("LPR").

After the I-130 had been approved, Romero filed a motion for administrative closure, advising that his wife had since become a naturalized U.S. citizen and that he wished to file a Form I-601A[2] for a provisional unlawful presence waiver. In order to file the Form, the removal proceedings had to be administratively closed. *See* 8 C.F.R. § 212.7(e)(4)(iii). As discussed further below, administrative closure is a procedural mechanism primarily employed for the convenience of the adjudicator (namely, IJs and the BIA) in order to allow cases to be removed from the active dockets of immigration courts, often so that individuals can pursue alternate immigration remedies—such as, in Romero's case, pursuing a provisional unlawful presence waiver. Romero advised that if his case

---

[1] I-130 forms are used by U.S. citizens and LPRs to begin petitioning for visas on behalf of, among others, their alien spouses. These forms establish a valid relationship between the petitioner and the beneficiary, the intended visa recipient. Only after an I-130 has been approved may the beneficiary begin applying for adjustment of status to become an LPR. If the beneficiary is already legally in the United States, he or she may begin applying for adjustment of status upon receipt of the I-130. But if he or she is outside or is not legally within the U.S., he or she must go through the consular process.

[2] Under the Immigration and Nationality Act (the "INA"), aliens who have been ordered removed or have been unlawfully present in the United States are subject to various bars of inadmissibility if they depart the country and apply for a visa from abroad. For example, aliens who have been unlawfully present in the U.S. for one year or more are inadmissible for ten years upon their departure. 8 U.S.C. § 1182(a)(9)(B)(i)(II).

However, these aliens may in certain circumstances obtain a waiver of this ten-year bar, including after demonstrating that it would result in extreme hardship to a U.S. citizen or LPR spouse or parent. *Id.* § 1182(a)(9)(B)(v). DHS developed Form I-601A (Application for Provisional Unlawful Presence Waiver) to permit certain immigrant visa applicants—spouses, children, or parents of U.S. citizens or LPRs—who require a waiver of inadmissibility for unlawful presence to apply for such a waiver in the U.S. before they depart for an immigrant visa interview at a U.S. embassy or consulate abroad, thereby expediting the visa process.

were administratively closed, then once the waiver had been approved, he intended to move to re-calendar and terminate removal proceedings so that he could then go through the consular process in Honduras.

At the final hearing in March 2017, the IJ ultimately denied Romero's motion for administrative closure on the basis that he did not satisfy any of the factors outlined in *Matter of Avetisyan*, 25 I. & N. Dec. 688 (B.I.A. 2012). Romero appealed to the BIA, which sustained his appeal, concluding in part that he had met "several if not all" of the *Avetisyan* factors. A.R. 21. The BIA then administratively closed Romero's case.

In December 2017, DHS filed a motion to reconsider. While that motion was pending, the Attorney General issued a precedential decision in *Matter of Castro-Tum* concluding that no statute or regulation grants IJs or the BIA the general authority to administratively close proceedings. Further, the Attorney General held that IJs and the BIA may only administratively close cases in situations where a specific regulation or judicially-approved settlement expressly authorizes such action. In June 2018, the BIA granted DHS' motion, concluding that *Castro-Tum* represented "a significant change in the law" and that it precluded the BIA from exercising any general administrative closure authority. A.R. 3. The BIA then dismissed Romero's appeal and ordered him removed to Honduras.

Romero timely petitioned for review with this Court, and we have jurisdiction pursuant to 8 U.S.C. § 1252(a)(5).[3]

II.

To set the context for our analysis of the merits of the parties' arguments, we note that administrative closure is a docketing tool that has been used by IJs and the BIA since at least the late 1980s. Administrative closure allows the adjudicator to temporarily remove a case from the active docket as a matter of "administrative convenience." *In re Gutierrez-Lopez*, 21 I. & N. Dec. 479, 480 (B.I.A. 1996) (internal quotation marks omitted); *see also Matter of Amico*, 19 I. & N. Dec. 652, 654 n.1 (B.I.A. 1988) (noting that "[t]he administrative closing of a case does not result in a final order," but "is merely an administrative convenience which allows the removal of cases from the calendar in appropriate situations"). By administratively closing a case, an IJ or the BIA "temporarily pause[s] removal proceedings" and places the case on hold, generally because there is an alternate form of case resolution pending, or because the case may be affected by events outside of the control of either party or that may not occur for some time. *Matter of W-Y-U-*, 27 I. & N. Dec. 17, 18 (B.I.A. 2017). After the case is administratively closed, either party may reactivate the case by filing a motion to re-calendar.

---

[3] During the appeal, the Government alerted the Court to a possible mootness issue. Based on the parties' written submissions to the Court, we are satisfied that we have jurisdiction given Romero's "legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (internal quotation marks omitted); *see also Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992) (noting that "[t]he availability of [a] possible remedy is sufficient to prevent [a] case from being moot").

General administrative closure is not specifically authorized by the INA or the regulations governing IJs or the BIA. *See Vahora v. Holder*, 626 F.3d 907, 917–18 (7th Cir. 2010) (noting that the general power to administratively close a case is "not a practice specified in the [INA]" or "mentioned in the current regulations," but is a "procedural device" employed by quasi-judicial bodies for "orderly management of the docket" and reviewable by courts).[4] However, administrative closure is explicitly authorized or required by federal regulations addressing specific classes of potential visa recipients[5] and pursuant to various judicially-approved settlement agreements. *See, e.g.*, *Barahona-Gomez v. Ashcroft*, 243 F. Supp. 2d 1029 (N.D. Cal. 2002) (requiring administrative closure for aliens who were improperly denied suspension of deportation but failed to appear for rescheduled hearings); *Am. Baptist Churches v. Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991) (requiring administrative closure for class members pending adjudication of claims by an asylum officer).

Although general administrative closure is not specifically mentioned in the INA or its regulations, the BIA has referenced two regulations that confer broad powers to IJs and

---

[4] This is in contrast to Article III courts, which possess the inherent equitable authority to administratively close cases. *See Penn-Am. Ins. Co. v. Mapp*, 521 F.3d 290, 295 (4th Cir. 2008) (explaining how district courts may administratively close cases, such as by removing them from the active docket, as a docket management tool). But, as discussed below, regulations governing IJs and the BIA nonetheless confer such authority.

[5] *See, e.g.*, 8 C.F.R. § 1214.2(a) (authorizing administrative closure for aliens who appear eligible for T non-immigrant status); 8 C.F.R. § 1214.3 (requiring administrative closure for aliens who appear eligible for V non-immigrant status); 8 C.F.R. § 1245.13(d)(3)(i) (requiring administrative closure in certain cases involving nationals of Cuba and Nicaragua who are eligible for LPR status); 8 C.F.R. § 1245.15(p)(4)(i) (same for certain Haitian nationals); 8 C.F.R. § 1245.21(c) (similar for certain nationals of Vietnam, Cambodia, and Laos).

6

the BIA to manage their dockets as the authority for administrative closure. First, 8 C.F.R. § 1003.10(b), which concerns the "powers and duties" of IJs, states in part:

> In conducting hearings under section 240 of the Act and such other proceedings the Attorney General may assign to them, immigration judges shall exercise the powers and duties delegated to them by the Act and by the Attorney General through regulation. In deciding the individual cases before them, and subject to the applicable governing standards, immigration judges shall exercise their independent judgment and discretion and may take *any action* consistent with their authorities under the Act and regulations that is *appropriate and necessary* for the disposition of such cases. . . . In all cases, immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the Act and regulations.

*Id.* (emphases added); *see also* 8 C.F.R. § 1240.1(a) (providing that IJs shall have the authority in any removal proceeding to "[d]etermine removability," "make decisions, including orders of removal," "determine applications," "order withholding of removal," and "take any other action consistent with applicable law and regulations as may be appropriate").

Second, 8 C.F.R. § 1003.1(d)(1)(ii), which governs the powers of the BIA, states that BIA members "shall exercise their independent judgment and discretion" and that "a panel or Board member to whom a case is assigned may take *any action* consistent with their authorities under the Act and the regulations *as is appropriate and necessary* for the disposition of the case." *Id.* (emphases added).

In *Matter of Avetisyan*, the BIA cited these two regulations in holding that IJs and the BIA were empowered to "take any action . . . as is appropriate and necessary for the disposition of [a] case." 25 I. & N. Dec. at 691. *Avetisyan* continued, "[d]uring the course of proceedings, an [IJ] or the [BIA] may find it necessary or, in the interests of justice and

7

fairness to the parties, prudent to defer further action for some period of time." *Id.* One way to do so would be to grant a continuance, which may be "appropriately utilized to await additional action required of the parties that will be, or is expected to be, completed within a reasonably certain and brief amount of time." *Id.* But when the parties must "await an action or event that is relevant to immigration proceedings but is outside the control of the parties or the court," or "may not occur for a significant or undetermined period of time," removing a case from the docket via administrative closure may be more "appropriate." *Id.* at 692. This latter course of administrative closure could facilitate "efficient[ ] management of the resources" of the immigration courts and the BIA.[6] *Id.* at 695; *see also Gonzalez-Caraveo v. Sessions*, 882 F.3d 885, 889–90 (9th Cir. 2018) (citing these regulations as authority for administrative closure). In this vein, the BIA has issued numerous decisions authorizing IJs to administratively close cases for a variety of reasons related to

---

[6] Prior BIA precedent required the Government's consent to administratively close a case. *In re Gutierrez-Lopez*, 21 I. & N. Dec. at 479. However, *Matter of Avetisyan* determined that an IJ may administratively close removal proceedings over a party's opposition if an assessment of six factors indicates it is appropriate to do so. 25 I. & N. Dec. at 696. These six factors include: (1) the reason administrative closure is sought; (2) the basis for any opposition to administrative closure; (3) the likelihood the respondent will succeed on any petition, application, or other action he or she is pursuing outside of removal proceedings; (4) the anticipated duration of closure; (5) the responsibility of either party, if any, in contributing to any current or anticipated delay; and (6) the ultimate outcome of the removal proceedings (for example, termination of the proceedings or entry of a removal order) when the case is re-calendared. *Id.*

In *Matter of W-Y-U-*, the BIA clarified that the "primary consideration" in such cases was "whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits." 27 I. & N. Dec. at 20. But "neither party has absolute veto power over administrative closure requests." *Id.* at 20 n.5 (internal citation and quotation marks omitted).

conservation of court resources, such as when a petitioner is awaiting processing of a visa petition by DHS, *Matter of Hashmi*, 24 I. & N. Dec. 785, 791 n.4 (B.I.A. 2009), or is awaiting the resolution of a direct appeal of a criminal conviction, *Matter of Montiel*, 26 I. & N. Dec. 555 (B.I.A. 2015).[7] Indeed, as of October 2018, over 330,000 cases remained administratively closed.

However, in 2018 the Attorney General issued a precedential decision holding that IJs and the BIA do not have the general authority to administratively close cases because "[n]either section 1003.10(b) nor section 1003.1(d)(1)(ii) confers" such authority. *Matter of Castro-Tum*, 27 I. & N. Dec. at 284.[8] In the Attorney General's view, "[g]rants of general authority to take measures 'appropriate and necessary for the disposition of such cases' would not ordinarily include the authority to suspend such cases indefinitely." *Id.* Furthermore, "[t]hese provisions . . . direct immigration judges or the Board to resolve matters 'in a timely fashion'—another requirement that conflicts with a general suspension

---

[7] One other common scenario in which IJs have been encouraged to employ administrative closure is when DHS and the respondent have agreed on the possibility of alternate case resolution. Memorandum from Brian M. O'Leary, Chief Immigration Judge, U.S. Dep't of Justice, Exec. Office for Immigration Review, to all Immigration Judges, on Operating Policies and Procedures Memorandum 13-01: Continuances and Administrative Closure (Mar. 7, 2013).

[8] In 2017, the BIA issued an unpublished decision involving a pro se respondent, Reynaldo Castro-Tum, who had been designated an unaccompanied alien child upon his arrival to the U.S. After the alien had failed to appear for his hearing, DHS asked the IJ to order him removed *in absentia*. But the IJ administratively closed proceedings over DHS' objection due to concerns over the reliability of the address on the hearing notice. DHS filed an interlocutory appeal; the BIA granted the appeal and remanded for further proceedings. But shortly thereafter, the Attorney General ordered the BIA to refer its decision to him pursuant to 8 C.F.R. § 1003.1(h)(1)(i), which authorizes the Attorney General to further review any BIA decision.

authority." *Id.* As a result, *Castro-Tum* held that IJs and the BIA may only administratively close cases when authorized to do so by a specific regulation or judicially-approved settlement. *Id.* at 282–92.[9] The Attorney General concluded that to the extent any existing regulations delegated the general authority to administratively close cases, he was exercising his "discretion to revoke it because the practice of administrative closure thwarts the efficient and even-handed resolution of immigration proceedings." *Id.* at 288 n.10. Finally, the decision instructed IJs and the BIA to re-calendar all other cases upon the filing of a motion by either party. *Id.* at 292–93.

Relying on *Castro-Tum*, the BIA determined it lacked the general authority to administratively close cases—including Romero's—and dismissed his appeal. Romero now asks this Court to review that decision and the BIA's reliance on *Castro-Tum*.

III.

A.

This Court reviews de novo the legal conclusions of the BIA, including issues of regulatory construction, but must afford appropriate deference to the BIA's interpretation of the INA and any attendant regulations. *See Perez-Vargas v. Gonzales*, 478 F.3d 191, 194 (4th Cir. 2007) (noting that "[w]e review de novo the legal conclusions of the BIA," but "give substantial deference to an agency's interpretations of its own regulations").

_____

[9] Of pertinence to this case, the decision noted in a pair of footnotes that IJs and the BIA could not administratively close cases for aliens wishing to seek provisional unlawful presence waivers. *Id.* at 277 n.3; 286 n.9.

10

Generally speaking, if a regulation is ambiguous, the Court gives substantial deference to an agency's interpretation of its own regulation pursuant to *Auer v. Robbins,* 519 U.S. 452, 461 (1997). *See Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512 (1994).[10]

As an initial matter, *Auer* deference "can arise only if a regulation is genuinely ambiguous." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019); *see also Christensen v. Harris Cty.,* 529 U.S. 576, 588 (2000). But a regulation can only be deemed "genuinely ambiguous" "[i]f uncertainty . . . exist[s]" "even after a court has resorted to all the standard tools of interpretation," including consideration of "text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on." *Kisor*, 139 S. Ct. at 2414–15. "If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law." *Id.* at 2415. Thus, our first task is to "determine whether the regulation itself is unambiguous; if so, its plain language controls." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,* 556 F.3d 177, 193 (4th Cir. 2009). "There can be no thought of deference unless, after performing that thoroughgoing review, the regulation remains

---

[10] In contrast to deference under *Chevron, U.S.A, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), in which we "give effect to an agency's regulation containing a reasonable interpretation of an ambiguous statute," *Christensen v. Harris Cty.*, 529 U.S. 576, 586–87 (2000), we may afford *Auer* deference to an agency's interpretation of a regulation that is ambiguous.

During this appeal, Romero informed the Court of a case pending before the Supreme Court, *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), concerning the viability and scope of *Auer* deference. Accordingly, we held Romero's case in abeyance pending the Supreme Court's decision in *Kisor*.

genuinely susceptible to multiple reasonable meanings and the agency's interpretation lines up with one of them." *Kisor*, 139 S. Ct. at 2419.

But even if the regulation is ambiguous, to receive *Auer* deference the "agency's reading must still be 'reasonable.'" *Id.* at 2415 (internal citation omitted). And even then, "not every reasonable agency reading" should be accorded deference because a court must still "make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* at 2416. This inquiry "does not reduce to any exhaustive test," but does rely on a number of "especially important markers." *Id.*

To start, the agency's interpretation of its own regulation must be its "authoritative or official position, rather than any more *ad hoc* statement not reflecting the agency's views." *Id.* (internal quotation marks omitted). In addition, the agency's interpretation must "implicate its substantive expertise," and may not address an "interpretive issue[]" that "may fall more naturally into a judge's bailiwick" or falls within another agency's "comparative expertise." *Id.* at 2417. Furthermore, the interpretation must reflect the "fair and considered judgment" of the agency, in contrast to those based on "*post hoc* rationalization[s]" and "convenient litigating position[s]." *Id.* (internal quotation marks omitted).

Finally—and most importantly for this case—*Auer* deference does not apply "to a new interpretation . . . that creates 'unfair surprise' to regulated parties." *Id.* at 2418. Such "disruption of expectations may occur" in several scenarios. *Id.* First, an agency may "substitute[] one view of a rule for another." *Id.* In such situations, the Supreme Court has "only rarely given *Auer* deference to an agency construction 'conflict[ing] with a prior'

12

one." *Id.* (alteration in original) (quoting *Thomas Jefferson Univ.*, 512 U.S. at 515). But second, "the upending of reliance may happen without such an explicit interpretive change." *Id.* Rather, an agency may—instead of issuing a new interpretation that conflicts with an older one—set forth an interpretation for the first time that is contrary to an established practice to which the agency has never objected. For example, the Supreme Court "recently refused to defer to an interpretation that would have imposed retroactive liability on parties for longstanding conduct that the agency had never before addressed." *Id.* (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155–56 (2012)). "Here too the lack of 'fair warning' outweighed the reasons to apply *Auer*." *Id.* (quoting *Christopher*, 567 U.S. at 156).

With this background of the process by which courts assess whether agency interpretations of regulations are to be afforded *Auer* deference, we now consider the Attorney General's interpretation of 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii) set forth in *Castro-Tum*. For the reasons explained below, we conclude that the plain language of 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii) unambiguously confers upon IJs and the BIA the general authority to administratively close cases such that an *Auer* deference assessment is not warranted. But even if the regulations were ambiguous, we alternatively conclude that deference under either *Auer* or *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), is not merited.

## B.

The first question before the Court is whether the INA implementing regulations unambiguously provide IJs and the BIA with the general authority to administratively close

13

cases. The Government argues that neither 8 C.F.R. § 1003.10(b) nor § 1003.1(d)(1)(ii) provides this authority. But Romero points to the expansive language in those regulations as conferring such authority: 8 C.F.R. § 1003.10(b) states that "[i]n deciding the individual cases before them . . . immigration judges shall exercise their independent judgment and discretion and may take *any action* . . . that is appropriate and necessary for the disposition of such cases" (emphasis added), and 8 C.F.R. § 1003.1(d)(1)(ii) states that the BIA "may take *any action* . . . as is appropriate and necessary for the disposition of the case" (emphasis added).

We agree with Romero. Applying the standard tools of interpretation—namely, a reading of the text of the relevant regulations—we clearly discern from the text that the authority of IJs and the BIA to administratively close cases is conferred by the plain language of 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii). *See Kisor*, 139 S. Ct. at 2414–15. Both regulations provide that IJs and the BIA "may take *any action* . . . appropriate and necessary for the disposition" of the case. 8 C.F.R. §§ 1003.1(d)(1)(ii) & 1003.10(b) (emphasis added). First, if we give the word "any" its plain meaning, that language grants IJs and the BIA broad discretion in how to manage and resolve cases because "[r]ead naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)). Given this, "*any* action . . . for the disposition of" the case is read most naturally to encompass actions of whatever kind appropriate for the resolution of a case. 8 C.F.R. §§ 1003.1(d)(1)(ii) & 1003.10(b) (emphasis added). In turn, this would plainly include docket management actions such as

14

administrative closure, which often facilitate, as discussed above and below, case resolution. This conclusion is further bolstered by comparing these regulations to the plain meaning accorded the word "any" in other cases where it is used in a statute or regulation. *See, e.g.*, *Ali v. Fed. Bureau of Prisons,* 552 U.S. 214, 220 (2008) (concluding that the use of the word "any" to modify "'other law enforcement officer' is most naturally read to mean law enforcement officers of whatever kind"); *Massachusetts v. EPA*, 549 U.S. 497, 529 (2007) ("The definition embraces all airborne compounds of whatever stripe, and underscores that intent through the repeated use of the word 'any.'"); *Brogan v. United States*, 522 U.S. 398, 400 (1998) ("By its terms, 18 U.S.C. § 1001 covers 'any' false statement—that is, a false statement 'of whatever kind.'"); *Gonzales*, 520 U.S. at 5 (concluding that the inclusion of the word "any" and the absence of restrictive language left no basis for limiting a provision in a sentencing statute); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 589 (1980) (concluding that the "expansive language" in certain statutory amendments, including the use of the word "any," offered "no indication whatever that Congress intended the limiting construction [of the statute] that the respondents [urged]"); *Citizens' Bank of La. v. Parker*, 192 U.S. 73, 81 (1904) ("The word *any* excludes selection or distinction. It declares the exemption without limitation."); *Int'l All. of Theatrical & Stage Emps. v. NLRB*, 334 F.3d 27, 34 (D.C. Cir. 2003) (noting that the use of "any" to modify the term "employee" "signals that 'employee' should receive its broadest statutory definition").

Second, administrative closure indisputably qualifies as an "action" under §§ 1003.10(b) and 1003.1(d)(1)(ii). *Castro-Tum* itself acknowledged as much by describing administrative closure as an "action." 27 I. & N. Dec. at 271.

Third, the only limitation in the text of §§ 1003.10(b) and 1003.1(d)(1)(ii) on the term "any action" is that the circumstances be "appropriate and necessary" for IJs and the BIA to administratively close a case.[11] As illustrated by *Matter of Avetisyan* and other BIA cases, administrative closure is "appropriate and necessary" in a variety of circumstances. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) ("One does not need to open up a dictionary in order to realize the capaciousness of th[e] phrase ['appropriate and necessary']."); *Sossamon v. Texas*, 563 U.S. 277, 286 (2011) (noting "the word 'appropriate' is inherently context dependent"); *Armour & Co. v. Wantock*, 323 U.S. 126, 129–30 (1944) (concluding the word "necessary" "has always been recognized as a word to be harmonized with its context"). For example, in *Avetisyan*, a woman placed in removal proceedings had married an LPR who was in the process of becoming a naturalized citizen. 25 I. & N. Dec. at 689. After her husband had obtained his citizenship, they filed a visa petition for adjustment of status and informed the IJ that they were awaiting adjudication of the petition by U.S. Citizenship and Immigration Services ("USCIS"), the DHS division which processes affirmative benefit applications. Although the IJ thereafter granted five additional continuances for USCIS to review the petition, USCIS could not complete its

---

[11] We reserve the question of whether the language "consistent with their authorities under the Act and regulations" in 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii) constitutes a limitation because it does not affect our analysis.

16

adjudication because it was required to transfer the file prior to each hearing before the IJ back to Immigration and Customs Enforcement, the DHS division which prosecutes removal proceedings. After two additional hearings, the IJ administratively closed proceedings to provide USCIS with an uninterrupted period in which to adjudicate the visa petition. *Id.* at 689–91. Without such administrative closure, the proceedings may have continued indefinitely as the file shuttled back and forth between the two DHS divisions.[12] Accordingly, administrative closure was clearly "appropriate and necessary." *See also Matter of Rajah*, 25 I. & N. Dec. 127, 135 n.10 (B.I.A. 2009) (encouraging administrative closure in "appropriate circumstances, such as where there is a pending prima facie approvable visa petition"); *Matter of Hashmi*, 24 I. & N. Dec. at 791 n.4 (same); *see also* 8 C.F.R. § 212.7(e)(4)(iii) (DHS regulation requiring individuals in removal proceedings to have the proceedings administratively closed prior to filing an application for a provisional waiver). Nothing in §§ 1003.10 or 1003.1(d)(1)(ii) indicates to the contrary.[13]

---

[12] *Avetisyan* also illustrates why, contrary to *Castro-Tum*, a continuation is not always the appropriate mechanism to resolve a proceeding. Continuances are a far more rigid procedural tool: as *Castro-Tum* itself noted, "continuances are for a fixed but potentially renewable period of time, and are granted upon a showing of 'good cause.'" 27 I. & N. Dec. at 291 (quoting 8 C.F.R. § 1003.29). Thus, expecting IJs and the BIA to employ continuances in the stead of administrative closure would further remove the discretion of these adjudicators to fashion the most flexible and appropriate resolution for a case.

[13] Two additional points from the Government warrant comment. First, to the extent that *Castro-Tum* contends that administrative closure is not authorized by these regulations because "the authority to suspend such cases indefinitely" "is the antithesis of a final disposition," 27 I. & N. Dec. at 284, *Avetisyan* demonstrates how suspension of the case may in fact expedite and result in a final disposition.

Second, the Attorney General argues that the regulations authorizing administrative closure in specific circumstances—including 8 C.F.R. §§ 1214.2(a), 1214.3,

17

Finally, the rest of the text of the relevant regulations supports the conclusion that IJs and the BIA possess broad discretion in how to manage their cases. With respect to IJs, § 1003.10(b) concludes, "[i]n all cases, immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the Act and regulations." As for the BIA, § 1003.1(d)(1) likewise provides that "[t]he Board shall resolve the questions before it in a manner that is timely, impartial, and consistent with the Act and regulations." As *Avetisyan* illustrates, administrative closure may—contrary to the Attorney General's argument in *Castro-Tum*, 27 I. & N. Dec. at 288–89—in fact facilitate the timely resolution of an issue or case. *See also* 8 C.F.R. § 1240.1(a)(1)(iv) (authorizing IJs to "take any other action consistent with applicable law and regulations as may be appropriate"). In sum, these regulations unambiguously confer upon IJs and the BIA the general authority to administratively close cases. Accordingly, there is no *Auer* deference analysis to be conducted. *Castro-Tum*'s interpretation of these regulations is therefore in error.

C.

1245.13(d)(3)(i), 1245.15(p)(4)(i), and 1245.21(c)—are rendered superfluous if the general authority to administratively close cases already exists under 8 C.F.R. §§ 1003.1(d)(1)(ii) and 1003.10(b). But the Attorney General's reasoning is undercut by his entry into various settlement agreements in which administrative closure is authorized or ordered by an Article III judge—that is, the Attorney General's position is internally contradictory because it would allow administrative closure to be used to implement a judicial settlement even though no regulation expressly authorizes administrative closure in such a situation. Furthermore, an Article III judge could not order IJs or the BIA to administratively close cases if IJs or the BIA lacked the authority to do so—yet they have done just that. Thus, the better reading is that judicial settlement is simply a circumstance in which administrative closure is an action deemed "necessary and appropriate" under the foregoing regulations.

18

Alternatively, even if we were to assume that the regulations were ambiguous, thus requiring the Court's assessment of *Castro-Tum* under *Auer* and *Kisor*, the Attorney General's reading of the regulations does not warrant deference because it amounts to an "unfair surprise" disrupting the regulated parties' expectations. *Kisor*, 139 S. Ct. at 2417–18 (quoting *Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158, 170 (2007)).

In *Christopher*, 567 U.S. at 153–59, the Supreme Court considered a Department of Labor ("DOL") interpretation of a regulation that helped to define "outside salesmen" exempt from the Fair Labor Standards Act's ("FLSA") overtime pay requirements. Longstanding industry practice had assumed the regulations had excluded the workers at issue, pharmaceutical sales representatives whose primary duty was to obtain nonbinding commitments from physicians to prescribe their employer's prescription drugs. But for the first time, the DOL interpreted the regulations at issue to encompass those workers, thereby potentially imposing liability on pharmaceutical employers for overtime pay. And although the DOL had issued its interpretation a number of years prior to the start of litigation, it had changed its reasoning for its interpretation throughout the course of court proceedings. *Id.* at 159.

The Supreme Court declined to afford *Auer* deference to the DOL's interpretation. *Id.* In reaching this conclusion, *Christopher* first explained the circumstances in which deference is unwarranted, such as "when there is reason to suspect that the agency's interpretation does not reflect the agency's fair and considered judgment on the matter in question," which "might occur when the agency's interpretation conflicts with a prior

19

interpretation." *Id.* at 155 (internal quotation marks omitted). The Court then considered

the specific DOL regulation at issue:

> In this case, there are strong reasons for withholding the deference that *Auer* generally requires. Petitioners invoke the DOL's interpretation of ambiguous regulations to impose potentially massive liability on respondent for conduct that occurred well before that interpretation was announced. To defer to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties "fair warning of the conduct [a regulation] prohibits or requires." *Gates & Fox Co. v. Occupational Safety and Health Review Comm'n,* 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.). Indeed, it would result in precisely the kind of "unfair surprise" against which our cases have long warned. *See Long Island Care at Home*[,] 551 U.S. [at] 170–171[] (deferring to new interpretation that "create[d] no unfair surprise" because agency had proceeded through notice-and-comment rulemaking); *Martin v. Occupational Safety and Health Review Comm'n,* 499 U.S. 144, 158 (1991) (identifying "adequacy of notice to regulated parties" as one factor relevant to the reasonableness of the agency's interpretation)[.]
>
> This case well illustrates the point. Until 2009, the pharmaceutical industry had little reason to suspect that its longstanding practice of treating [these representatives] as exempt outside salesmen transgressed the FLSA. The statute and regulations certainly do not provide clear notice of this[, given the broad catchall phrases employed in the regulations].

*Id.* at 155–57. The Supreme Court noted that "[e]ven more important, despite the industry's

decades-long practice of classifying [these representatives] as exempt employees, the DOL

never initiated any enforcement actions with respect to [these representatives] or otherwise

suggested that it thought the industry was acting unlawfully." *Id.* at 157. Although

enforcement actions were a matter of agency policy and discretion, "where, as here, an

agency's announcement of its interpretation is preceded by a very lengthy period of

conspicuous inaction, the potential for unfair surprise is acute." *Id.* at 158 (citing *Dong Yi*

*v. Sterling Collision Ctrs., Inc.,* 480 F.3d 505, 510–11 (7th Cir. 2007)) (noting that although

20

it was possible the industry was in violation of the FLSA for a long time without DOL noticing, "the more plausible hypothesis is that [DOL] did not think the industry's practice was unlawful" (internal quotation marks omitted)); *see also Gomez v. Lynch*, 831 F.3d 652, 658 (5th Cir. 2016) (declining to afford *Auer* deference to a new BIA interpretation of a regulation because the BIA's "contradictory interpretations show that its current litigation position does not represent the agency's considered and expertise-driven judgment as to the correct reading of [the regulation]"); *Barboza v. Cal. Ass'n of Prof'l Firefighters*, 799 F.3d 1257, 1268 (9th Cir. 2015) (holding that an agency's "internally inconsistent" interpretations lacked the "hallmarks of thorough consideration," therefore failing to warrant either *Auer* or *Skidmore* deference); *Radford v. Colvin*, 734 F.3d 288, 294 (4th Cir. 2013) (declining to afford *Auer* deference to a regulatory interpretation from the Social Security Commissioner because "the Commissioner point[ed] to no other authority . . . that suggests that the Commissioner has ever adopted [this specific] requirement until her briefing to this Court" and because it was "plainly inconsistent with the text and structure of the regulation"); *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*, 730 F.3d 1024, 1034–35 (9th Cir. 2013) (declining to afford *Auer* deference to a new DOL interpretation because "the DOL's interpretation is inconsistent with its prior interpretation, and there is a significant potential for unfair surprise").

The issue here appears to be indistinguishable in all pertinent respects from these cases. As in *Christopher*, 567 U.S. at 155–56, the new interpretation in *Castro-Tum* (1) breaks with decades of the agency's use and acceptance of administrative closure and (2) fails to give "fair warning" to the regulated parties of a change in a longstanding procedure.

21

As described above, administrative closure has been a procedural mechanism employed by IJs and the BIA since the late 1980s and consistently reaffirmed—even if its precise contours have changed—through the BIA's precedential decisions, particularly in *Gutierrez-Lopez*, *Avetisyan*, and *W-Y-U-*. Accordingly, numerous petitioners have relied on this long-established procedural mechanism to proceed through the immigration process. To suddenly change this interpretation of the regulation undermines the significant reliance interests such petitioners have developed. As *Christopher* noted, such a sudden shift in longstanding agency interpretation frustrates mechanisms for predictability that are supposed to be baked into the administrative process.[14] 567 U.S. at 158.

This conclusion is bolstered by the further consideration that *Castro-Tum* is internally inconsistent. Although one of its purported concerns is efficient and timely administration of immigration proceedings, it would in fact serve to lengthen and delay many of these proceedings by: (1) depriving IJs and the BIA of flexible docketing measures sometimes required for adjudication of an immigration proceeding, as illustrated by *Avetisyan*, and (2) leading to the reopening of over 330,000 cases upon the motion of either party, straining the burden on immigration courts that *Castro-Tum* purports to alleviate. For all of these reasons, *Castro-Tum* is not entitled to *Auer* deference.

D.

---

[14] Of course, administrative closure can be limited by Congress via statute or by a change in the regulation that complies with the Administrative Procedure Act—as required by both the majority and minority views in *Kisor*, 139 S. Ct. at 2420, 2434.

In the absence of *Auer* deference, the weight given to a BIA decision "hinges on the thoroughness evident in [the BIA's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade"—that is, whether the interpretation should be afforded *Skidmore* deference. *Zavaleta–Policiano v. Sessions*, 873 F.3d 241, 246 n.2 (4th Cir. 2017) (internal quotation marks omitted). And here, a court reviewing *Castro-Tum* for *Skidmore* deference would not be persuaded to adopt the agency's own interpretation of its regulation for substantially the same reasons it is not entitled to *Auer* deference: because it represents a stark departure, without notice, from long-used practice and thereby cannot be deemed consistent with earlier and later pronouncements. As a result, it lacks the "power to persuade." *Id.*; *see also Kisor*, 139 S. Ct. at 2427 (Gorsuch, J., concurring) (contending that an agency interpretation of a regulation should as an initial matter be "entitled only to a weight proportional to 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade'" (quoting *Skidmore*, 323 U.S. at 140)). Put another way, even under the view set forth by Justice Gorsuch in *Kisor*, the Attorney General's interpretation would amount to a failure of proof because the evidence—that is, *Castro-Tum*—comes too late in the game.

\* \* \* \*

In sum, the result is that 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii) unambiguously confer upon IJs and the BIA the general authority to administratively close cases such that the BIA's decision should be vacated and remanded.

## IV.

For the reasons stated above, we conclude that the relevant regulations confer the general authority to administratively close cases to IJs and the BIA. We therefore grant the petition for review, vacate the BIA's order, and remand for proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED;*
*VACATED AND REMANDED*