**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3695
_____

DAVID JAROSLAWICZ

v.

M&T BANK CORPORATION; HUDSON CITY
BANCORP INC.;*THE ESTATE OF ROBERT G.
WILMERS, BY ITS PERSONAL REPRESENTATIVES
ELISABETH ROCHE WILMERS, PETER MILLIKEN,
AND HOLLY MCALLISTER SWETT; RENE F. JONES;
MARK J. CZARNECKI; BRENT D. BAIRD; ANGELA C.
BONTEMPO; ROBERT T. BRADY; T. JEFFERSON
CUNNINGHAM, III; GARY N. GEISEL; JOHN D.
HAWKE, JR.; PATRICK W.E. HODGSON; RICHARD G.
KING; JORGE G. PEREIRA; MELINDA R. RICH;
ROBERT E. SADLER, JR.; HERBERT L. WASHINGTON;
DENIS J. SALAMONE; MICHAEL W. AZZARA;
VICTORIA H. BRUNI; DONALD O. QUEST; JOSEPH G.
SPONHOLZ; CORNELIUS E. GOLDING; WILLIAM G.
BARDEL; SCOTT A. BELAIR

BELINA FAMILY; JEFF KRUBLIT,
                                              Appellants

(*Amended pursuant to Clerk's Order dated 3/1/18)

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-15-cv-00897)
District Judge: Honorable Richard G. Andrews

_____

Argued: July 17, 2018

Before: McKEE, MATEY, and SILER, JR.,[†] *Circuit Judges*.

(Filed: June 18, 2020)

Deborah R. Gross                    **[ARGUED]**
Kaufman Coren & Ress
2001 Market Street
Two Commerce Square, Suite 3900
Philadelphia, Pennsylvania 19103

Francis J. Murphy
Jonathan L. Parshall
Murphy & Landon
1011 Centre Road
Suite 210
Wilmington, Delaware 19805

Laurence D. Paskowitz
Suite 380
208 East 51st Street

---

[†] Honorable Eugene E. Siler, Jr., Senior Judge for the Sixth Circuit Court of Appeals, sitting by designation.

New York, New York 10022

*Counsel for Appellants Belina Family and Jeff Krublit*

George T. Conway, III
Adam L. Goodman
Bradley R. Wilson          **[ARGUED]**
Jordan L. Pietzsch
Wachtell Lipton Rosen & Katz
51 West 52nd Street
New York, New York 10019

John C. Cordrey
Brian M. Rostocki
Reed Smith
1201 Market Street
Suite 1500
Wilmington, Delaware 19801

*Counsel for Appellees M&T Bank Corporation, The Estate of Robert G. Wilmers, Rene F. Jones, Mark J. Czarnecki, Brent D. Baird, Angela C. Bontempo, Robert T. Brady, T. Jefferson Cunningham, III, Gary N. Geisel, John D. Hawke, Jr., Patrick W. E. Hodgson, Richard G. King, Jorge G. Pereira, Melinda R. Rich, Robert E. Sadler, Jr., and Herbert L. Washington*

Tracy R. High
Sullivan & Cromwell
125 Broad Street
New York, New York 10004

Kevin R. Shannon
Potter Anderson & Corroon
1313 North Market Street
Hercules Plaza, 6th Floor
P.O. Box 951
Wilmington, Delaware, 19801

> *Counsel for Appellees Denis J. Salamone, Victoria H. Bruni, Donald O. Quest, Joseph G. Sponholz, Scott A. Belair, Michael W. Azzara, William G. Bardel and Cornelius E. Golding*

_____

OPINION

_____

MATEY, *Circuit Judge.*

It is a familiar story in the life of a publicly held business. A corporation identifies an opportunity and decides to ask its shareholders for their approval to pursue. But the business runs in a highly regulated space like finance. So the company proceeds through a thick web of laws and regulations that detail how to explain both the risks and the rewards of the opportunity to the shareholders. With a bit of good fortune, all the hard work pays off when the shareholders give their blessing. And then, after the deal is done, only the class action hurdle remains. That is because for more than five decades, these transactions have been subject to a three-tier system of enforcement: oversight by Congress, supervision by regulators like the Securities and Exchange Commission, and "private

4

attorneys general"[1] pursuing "a private right of action." *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 932 (3d Cir. 1992) (citing *J.I. Case Co. v. Borak*, 377 U.S. 426, 430–31 (1964)).

We consider that final frontier of enforcement in this appeal. Hudson City Bank ("Hudson") and M&T Bank Corporation ("M&T") successfully merged in 2015. But their union triggered a protest by a few Hudson shareholders, who filed a putative class action (together, the "Shareholders"). The complaint alleged the banks didn't disclose material information about M&T's practice of adding fees to no-fee "free" checking accounts or its failure to comply with federal anti-money laundering regulations. And despite a healthy return on their investment, the Shareholders argue these omissions or misstatements caused all Hudson shareholders financial harm. In a comprehensive opinion, the District Court dismissed these claims. We now vacate and remand for further proceedings based on prior decisions allowing suits alleging inadequate transparency or deception. We reiterate the longstanding limitations on securities fraud actions that insulate issuers from second-guesses, hindsight clarity, and a regime of total disclosure.

---

[1] Most ascribe the colorful phrase to Judge Jerome Frank. *Associated Indus. N.Y. State, Inc. v. Ickes*, 134 F.2d 694, 704 (2d Cir. 1943), *vacated*, 320 U.S. 707 (1943).

5

## I. BACKGROUND

### A. The Proposal

Chartered in 1868, Hudson grew to become one of the largest savings banks in New Jersey. Avoiding modern products and trends in favor of steady deposits and safe mortgages, Hudson enjoyed a strong reputation of stability. But, following the 2008 recession, Hudson struggled to hold its footing. It launched reforms, shedding debt, eying diversification, and considering opportunities to merge. Eventually, Hudson found a partner in M&T and the two banks struck a deal. Investors appeared to welcome the announcement with M&T's stock price rising on the news.

### B. The Joint Proxy

The merger agreement promised Hudson shareholders a mixture of cash and M&T stock, and required approval by the shareholders of both banks. To provide the required notice, Hudson and M&T opted to issue a Joint Prospectus ("Joint Proxy") and filed a single Form S-4 in accordance with SEC rules.[2] That form requires issuers to provide, among other things, "the information required by Item 503 of Regulation S-

---

[2] Firms may use Form S-4 to register securities issued in a merger. (Docket Entry Dated July 13, 2018: Letter from David R. Fredrickson, Chief Counsel/Associated Director, Division of Corporate Finance, United States Securities and Exchange Commission (July 12, 2018).) The form also allows for the filing of a joint prospectus/proxy statement, as M&T and Hudson elected to do here.

K." Item 503, since recodified as Item 105,[3] asks for "the most significant factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105. Each "risk factor" requires an individual topic heading supported by information that is both "concise and organized logically." *Id.* Specificity is key, as the regulation cautions filers to omit "risks that could apply generically to any registrant or any offering." *Id.* And Item 105 is where the Shareholders direct their attack, alleging this portion of the Joint Proxy was misleading and incomplete. We turn to those disclosures.

### 1. The "Risks Related to M&T"

As required, the Joint Proxy included a section titled "Risks Related to M&T" (App. at 0237), with subsections on "Risks Relating to Economic and Market Conditions," "Risks Relating to M&T's Business," and "Risks Relating to the Regulatory Environment." (App. at A0237–48.) Discussing the regulatory environment, the Joint Proxy noted that "M&T is subject to extensive government regulation and supervision" because of "the Dodd-Frank Act and related regulations." (App. at A1010 (emphasis omitted).) It cautioned that "M&T expects to face increased regulation of its industry as a result of current and possible future initiatives." (App. at A1010.) That will lead to "more intense scrutiny in the examination process and more aggressive enforcement of regulations on both the federal and state levels," which would "likely increase M&T's costs[,] reduce its revenue[,] and may limit its ability to pursue certain desirable business opportunities." (App. at

---

[3] *See* FAST Act Modernization and Simplification of Regulation S-K, 84 FR 12674, 12716–17 (April 2, 2019). We will refer to the current regulation.

A1010.) The Joint Proxy also stated that "from time to time, M&T is, or may become, the subject of governmental and self-regulatory agency information-gathering requests, reviews, investigations and proceedings and other forms of regulatory inquiry, including by the SEC and law enforcement authorities." (App. at A0248.) That ongoing oversight, in turn, might lead to "significant monetary damages or penalties, adverse judgments, settlements, fines, injunctions, restrictions on the way in which M&T conducts its business, or reputational harm." (App. at A0248.) And the Joint Proxy noted operational risks "encompass[ing] reputational risk and compliance and legal risk, which is the risk of loss from violations of, or noncompliance with, laws, rules, regulations, prescribed practices or ethical standards, as well as the risk of noncompliance with contractual and other obligations." (App. at A0245.) That dense fog of possible problems, as we will see, looms large.

2.    Other Warnings

A few additional statements related to risk appeared elsewhere in the Joint Proxy. A section titled, "Regulatory Approvals Required for the Merger" advised that "[c]ompletion of the merger . . . [is] subject to the receipt of all approvals required to complete the transactions contemplated by the merger agreement . . . from the Federal Reserve Board." (App. at A1017.) And the Federal Reserve Board, "[a]s part of its evaluation . . . , reviews: . . . the effectiveness of the companies in combatting money laundering." (App. at A1018.) While M&T "believe[d]" timely regulatory approval was realistic, it was unsure. (App. at A1017; *see also* App. at A1009.) Rather, M&T offered that:

8

Although we currently believe we should be able to obtain all required regulatory approvals in a timely manner, we cannot be certain when or if we will obtain them or, if obtained, whether they will contain terms, conditions or restrictions not currently contemplated that will be detrimental to M&T after the completion of the merger or will contain a burdensome condition.

(App. at A1017.)

### 3. The Annual Report

At M&T's election, the Joint Proxy incorporated M&T's 2011 Annual Report on Form 10-K as permitted by Form S-4. There, M&T warned that the Patriot Act requires that "U.S. financial institutions . . . implement and maintain appropriate policies, procedures and controls which are reasonably designed to prevent, detect and report instances of money laundering." (App. at A1028.) But investors could take comfort, the Joint Proxy explained, because M&T's "approved policies and procedures [are] believed to comply with the USA Patriot Act." (App. at A1028.)

### C. New Disclosures, Governmental Intervention, and Regulatory Delay

M&T filed the Joint Proxy with the SEC, which was declared effective on February 22, 2013, mailed it to all shareholders five days later, and scheduled a vote on the proposal for April. Then, a few days before the ballots, M&T and Hudson announced that "additional time will be required to obtain a regulatory determination on the applications

9

necessary to complete their proposed merger." (App. at A1041.) In a supplemental proxy, M&T revealed that the Federal Reserve Board identified "certain regulatory concerns" about "procedures, systems and processes relating to M&T's Bank Secrecy Act and anti-money-laundering compliance program."[4] (App. at A1041.) M&T explained that to address these concerns, "the timeframe for closing the transaction will be extended substantially beyond the date previously expected." (App. at A1041.) As a result, M&T and Hudson amended their merger agreement and moved the closure back

---

[4] As the Joint Proxy notes, the merger required approval by the Federal Reserve Board, among other regulators. As part of its review, the Federal Reserve Board assesses the banks' effectiveness in combatting money laundering, requiring a risk-management program incorporating the Bank Secrecy Act and anti-money-laundering ("BSA/AML") compliance. *See* Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism ("USA PATRIOT") Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (codified at various sections of the U.S. Code). Title III of the Act, captioned "International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001," amended the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.*, and "imposed more stringent requirements aimed at money laundering." *Mendez Internet Mgmt. Servs., Inc. v. Banco Santander de P.R.*, 621 F.3d 10, 13 (1st Cir. 2010). To ensure compliance, banks must collect, process, and update information necessary to make money-laundering risk determinations for every customer and account. Banks are also required to have in place acceptable processes and policies to detect and report related suspicious activity.

several months.[5] The shareholder vote, however, remained as scheduled. And these revelations did not deter the shareholders, who overwhelmingly approved the merger. But it took nearly two and a half more years before regulators allowed the deal to close.

While the banks awaited the conclusion of the Federal Reserve review, M&T received more bad news. The Consumer Financial Protection Bureau ("CFPB") announced an enforcement action against M&T for offering customers free checking before switching them to fee-based accounts without notice. A practice, the CFPB noted, that was in place when the merger was first proposed, and that had impacted nearly 60,000 customers. M&T agreed to pay $2.045 million to settle the allegations, the approximate amount of the customer injuries.

## D.    The Shareholder Suit

A few weeks before the merger closed, David Jaroslawicz, a Hudson shareholder, filed a putative class action against M&T, Hudson, and their directors and officers (together, "M&T"). He claimed that the Joint Proxy omitted material risks associated with the merger in violation of the Securities Exchange Act, 15 U.S.C. § 78n(a)(1) and 17 C.F.R.

---

[5] M&T provided more context a few days later during an earnings conference call, explaining that the compliance issues were significant enough to "impact [the] ability to close the merger . . . in the near term." (App. at A1048.) And M&T noted it needed "to implement [a] plan for improvement . . . to the satisfaction of . . . the regulators prior to obtaining regulatory approvals for the merger." (App. at A1048.)

§ 240.14a-9(a). He also brought a claim for breach of fiduciary duty under Delaware law.[6]

After the Shareholders filed an amended complaint, M&T moved to dismiss for failure to plead an actionable claim. The District Court granted that motion, but allowed the Shareholders to amend. After the Shareholders amended, M&T again moved to dismiss. The District Court granted M&T's motion. *See Jaroslawicz v. M&T Bank Corp.*, 296 F. Supp. 3d 670 (D. Del. 2017).

In their Second Amended Complaint, the Shareholders presented two theories of M&T's liability for the Joint Proxy's deficiencies. First, because the Joint Proxy did not discuss M&T's non-compliant BSA/AML practices and deficient consumer checking program, the Shareholders contend that M&T failed to disclose material risk factors facing the merger, as required by Item 105. Second, they assert that M&T's failure to discuss these allegedly non-compliant practices rendered M&T's opinion statements about its adherence to regulatory requirements and the prospects for prompt approval of the merger, misleading.

The District Court held that the Joint Proxy sufficiently disclosed the regulatory risks associated with the merger. The Court also held that M&T did not have to disclose the consumer checking violations exposed after the merger announcement. And, applying *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575

---

[6] The District Court later appointed the Belina family to serve as lead plaintiffs for the class action.

12

U.S. 175 (2015), the Court found no misleading opinions. The Court again allowed the Shareholders to amend the pleadings, but the Shareholders asked for a final order of dismissal with prejudice to file this appeal.[7]

## II. JURISDICTION AND THE STANDARD OF REVIEW

The District Court had jurisdiction under 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337. We have jurisdiction under 28 U.S.C. § 1291. As the Shareholders bring their appeal from the District Court's final order granting a motion to dismiss with prejudice, we exercise plenary review. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1322–23 (3d Cir. 2002). But we are to accept the facts in the light most favorable to the non-moving party. *Jones v. ABN Amro Mortg. Grp., Inc.*, 606 F.3d 119, 123 (3d Cir. 2010). Dismissal is proper only where the complaint fails to state a claim "that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is plausible "when the plaintiff pleads factual content that allows the courts to draw

---

[7] Following a panel decision of this Court, M&T petitioned for en banc review or a panel rehearing, and we granted the latter request. *See Jaroslawicz v. M&T Bank Corp.*, 925 F.3d 605 (3d Cir. 2019). In its petition for rehearing, M&T waived the argument that the Shareholders' Second Amended Complaint failed to plausibly allege loss causation. (Appellees' Reh'g Pet. at 6.)

13

the reasonable inference that the defendant is liable for the misconduct alleged."[8] *Id.*

## III. THE SHAREHOLDERS' TWIN THEORIES OF LIABILITY: ACTIONABLE OMISSIONS AND MISLEADING OPINIONS

### A. The Shareholders Plausibly Allege an Actionable Omission or Misrepresentation

#### 1. Actionable Omissions and Misrepresentations Defined

We start by setting some boundaries. The Shareholders have pleaded claims under Section 14(a) of the Securities Exchange Act of 1934, as codified at 15 U.S.C. § 78n(a), and the regulations promulgated by the Commission. But that statute does not provide for a private right of action. And since "Congress creates federal causes of action," where "the text of a statute does not provide a cause of action, there ordinarily is no cause of action." *Johnson v. Interstate Mgmt. Co.*, 849 F.3d 1093, 1097 (D.C. Cir. 2017); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 313 (2012) ("A statute's mere prohibition of a certain act does not imply creation of a private right of action for its violation.").

---

[8] The District Court reviewed the allegations under the general pleading standard of Federal Rule of Civil Procedure 8, but M&T argues that all § 14(a) claims are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b)(1). Still, the parties agree on the statements alleged to have been misleading, do not dispute their specificity, and thus do not argue that the pleading standard is determinative.

But during an "*ancien regime*," courts followed a different path, often finding "as a routine matter . . . impl[ied] causes of action not explicit in the statutory text itself." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017). And while courts have since "adopted a far more cautious course before finding implied causes of action," *id.*, in securities fraud actions under § 14(a) what was then is still now. *Cathcart*, 980 F.2d at 932 (citing *Borak*, 377 U.S. at 430–31); *see also Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 284 (2014) (Thomas, J., concurring) ("[T]he implied 10b-5 private cause of action is 'a relic of the heady days in which this Court assumed common-law powers to create causes of action[.]'") (quoting *Corr. Servs. Corp. v. Malesko,* 534 U.S. 61, 75 (2001) (Scalia, J., concurring)). So while courts have since "sworn off the habit of venturing beyond Congress's intent," the Shareholders' suit, for now, still finds room in the half-empty "last drink" poured in *Borak. Alexander v. Sandoval*, 532 U.S. 275, 287 (2001); *see also Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 298 (3d Cir. 2007) (noting *Borak* arrived during an "older and less restrictive approach to implied private rights of action"). Reconsideration of that interpretation is beyond our role, *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016), even if perhaps not beyond the horizon. *See Emulex Corp. v. Varjabedian*, 139 S. Ct. 1407 (2019).

2.      The Elements of an Omissions Claim

Section 14(a) makes it unlawful to solicit a proxy "in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a)(1). It "seeks to prevent management or others from obtaining authorization for corporate actions by means of deceptive or

15

inadequate disclosures in proxy solicitations." *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006) (internal quotations marks omitted). In turn, Rule 14a-9, promulgated by the SEC under the authority of Section 14(a), bars "false or misleading" material statements and omissions in a proxy.[9] The Shareholders allege that M&T violated Rule 14a-9, and thus Section 14(a), by issuing a Joint Proxy lacking material information.

We have outlined a three-step test for liability under Section 14(a), requiring a showing that: "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007) (internal quotation marks omitted). And omissions in a proxy statement can violate Section 14(a) and Rule 14a-9 in one of two ways: where "[(a)] the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or [(b)] the omission makes other statements in the proxy statement materially false or misleading." *Seinfeld*, 461 F.3d at 369 (internal quotation marks omitted).

---

[9] "No solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

But not every omission or misrepresentation will support a claim for damages. *Tracinda Corp.*, 502 F.3d at 228. Rather, stated or omitted information must be "material," and we have set forth a two-part definition. *Id.* First, we determine whether "there is a substantial likelihood that a reasonable shareholder would consider [the omission or misrepresentation] important in deciding how to vote." *Id.* (quoting *Shaev v. Saper*, 320 F.3d 373, 379 (3d Cir. 2003)). That involves an assessment of whether "the disclosure of the omitted fact or misrepresentation would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *EP Medsystems, Inc., v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000) (internal quotation marks and brackets omitted).

Second, we assess the materiality of a statement "at the time and in the light of the circumstances under which it is made." *Seinfeld*, 461 F.3d at 369 (quoting 17 C.F.R. § 240.14a-9(a)). So "liability cannot be imposed on the basis of subsequent events," *In re NAHC*, 306 F.3d at 1330, and the Monday morning quarterback remains on the bench.

3.    The Second Amended Complaint Plausibly Alleges Actionable Omissions

With the rules set, we turn to the words in the complaint and in the governing regulations.

17

The Shareholders allege M&T violated Section 14(a) because the Joint Proxy omitted material "risk factors" as required by Item 105, such as the condition of M&T's regulatory compliance program, and its failure to disclose such risks made other statements misleading. As with statutory interpretation, our review of a regulation centers on the ordinary meaning of the text "and the court must give it effect, as the court would any law." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). That analysis uses all the "'traditional tools' of construction." *Id*. (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 843 n.9 (1984)). The text of Item 105 directs issuers to:

> [w]here appropriate, provide under the caption "Risk Factors" a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky. This discussion must be concise and organized logically. Do not present risks that could apply generically to any registrant or any offering. Explain how the risk affects the registrant or the securities being offered. Set forth each risk factor under a subcaption that adequately describes the risk. . . . The registrant must furnish this information in plain English.

17 C.F.R. § 229.105. While "regulations can sometimes make the eyes glaze over," *Kisor*, 139 S. Ct. at 2415, readers easily understand Item 105 to require issuers to disclose the most significant factors known to make an investment speculative or

risky. And those factors should be (a) concise and organized; (b) specific, not generic; and (c) include an explanation connecting the risks to the offer.[10] 17 C.F.R. § 229.105.

Language in guidance from the SEC details these requirements. *See Kisor*, 139 S. Ct. at 2415 (discussing the traditional "legal toolkit" of "text, structure, history, and purpose of a regulation"); *see also Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 438–39 (3d Cir. 2018) (discussing agency guidance to inform ordinary meaning). A 1999 legal bulletin is particularly helpful. *See* SEC Division of Corporation Finance: Updated Staff Legal Bulletin No. 7, "Plain English Disclosure," Release No. SLB-7, 1999 WL 34984247 (June 7, 1999). Under the section titled "Risk Factor Guidance," the SEC explains that "issuers should not present risks that could apply to any issuer or any offering." *Id.* at *1. The SEC also explains that Item 105 risk factors fall loosely into three broad categories:

> **Industry Risk** — risks companies face by virtue of the industry they're in. For example, many [real estate investment trusts] run the risk that,

---

[10] The parties do not argue that Section 229.105 creates an independent cause of action. *Cf. Oran v. Stafford*, 226 F.3d 275, 287–88 (3d Cir. 2000) (concluding that Item 303 does not create an independent cause of action for private plaintiffs). And we note that neither the language of Section 229.105, nor the SEC's interpretive guidance suggests that it does. *Id.* at 287. So our inquiry turns on whether the duty of disclosure mandated by Item 105, if violated, constitutes a material omission or misrepresentation under the standards of Section 14(a) and its regulations.

despite due diligence, they will acquire properties with significant environmental issues.

**Company Risk** — risks that are specific to the company. For example, a [real estate investment trust] owns four properties with significant environmental issues and cleaning up these properties will be a serious financial drain.

**Investment Risk** — risks that are specifically tied to a security. For example, in a debt offering, the debt being offered is the most junior subordinated debt of the company.

When drafting risk factors, be sure to specifically link each risk to your industry, company, or investment, as applicable.

*Id.* at *5–6.

The bulletin includes a few illustrations contrasting a generic discussion with a satisfactory disclosure. *Id.* at *1, *6–7. Here's one example:

**Before:**

*Competition*

The lawn care industry is highly competitive. The Company competes for commercial and retail customers with national lawn care service providers, lawn care product manufacturers with service components, and other local and regional

20

producers and operators. Many of these competitors have substantially greater financial and other resources than the Company.

**After:**

***Because we are significantly smaller than the majority of our national competitors, we may lack the financial resources needed to capture increased market share.***

Based on total assets and annual revenues, we are significantly smaller than the majority of our national competitors: we are one-third the size of our next largest national competitor. If we compete with them for the same geographical markets, their financial strength could prevent us from capturing those markets.

For example, our largest competitor did the following when it aggressively expanded five years ago:

• launched extensive print and television campaigns to advertise their entry into new markets;

• discounted their services for extended periods of time to attract new customers; and

• provided enhanced customer service during the initial phases of these new relationships.

Our national competitors likely have the financial resources to do the same, and we do not have the financial resources needed to compete on this level.

***Because our local competitors are better positioned to capitalize on the industry's fastest growing markets, we may emerge from this period of growth with only a modest increase in market share, at best.***

Industry experts predict that the smaller, secondary markets throughout the mid-west will soon experience explosive growth. We have forecasted that about 17% of our future long-term growth will come from these markets. However, because it is common practice for lawn care companies in smaller markets to acquire customers through personal relationships, our competitors in nearly half of these mid-west markets are better positioned to capitalize on this anticipated explosive growth. Unlike us, these local competitors live and work in the same communities as their and our potential customers.

For the foreseeable future, the majority of our sales people who cover these markets will work out of our two mid-west regional offices because we lack the financial resources to open local offices at this time. As a result, we may substantially fail to realize our forecasted 17% long-term growth from these markets.

*Id.* at \*6. In short, while Item 105 seeks a "concise" discussion, free of generic and generally applicable risks, it requires more than a short and cursory overview and instead asks for a full discussion of the relevant factors.[11] 17 C.F.R. § 229.105. That, as we will see, is where the Joint Proxy fell, in a word, short.

### ii. Interpretative Guidance from Other Courts

Two cases considering the scope of adequate disclosures under Item 105 are also instructive. In *Silverstrand Investments v. AMAG Pharmaceuticals, Inc.*, the First Circuit identified plausible allegations that a pharmaceutical company's offering documents failed to adequately convey risks associated with a clinical drug. 707 F.3d 95, 108 (1st Cir. 2013). In the offering, the company included details about the FDA approval process and the results of clinical trials. *Id.* at 98–99. But the company did not disclose almost two dozen "Serious Adverse Events" it had reported to the FDA. *Id.* at 99. Instead, the offering noted only "ongoing FDA regulatory requirements" that carry the risk of "restrictions on our ability to market and sell" and other "sanctions." *Id.* Reviewing both the language of the regulation and the SEC's interpretive

---

[11] As the SEC explains, "[t]he goal of plain English is clarity, not brevity. Writing disclosure in plain English can sometimes increase the length of particular sections of your prospectus. You will likely reduce the length of your plain English prospectus by writing concisely and eliminating redundancies — not by eliminating substance." *See* SEC Legal Bulletin No. 7, 1999 WL 34984247, at \*5.

23

guidance, the First Circuit held that "a complaint alleging omissions of Item [105] risks needs to allege sufficient facts to infer that a registrant knew, as of the time of an offering, that . . . a risk factor existed." *Id*. at 103. And given the many adverse reports the company submitted to the FDA, the court concluded the allegations "more than suffice" to plead a plausible claim of undisclosed risk. *Id.* at 104.

Compare those facts to *City of Pontiac Policemen's and Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 183–84 (2d Cir. 2014), alleging that UBS engaged in a tax evasion scheme. Following the indictment of UBS employees, the company disclosed "multiple legal proceedings and government investigations" showing exposure "to substantial monetary damages and legal defense costs," along with "criminal and civil penalties, and the potential for regulatory restrictions." *Id*. at 184 (internal brackets omitted). Not enough, argued plaintiffs, claiming UBS was also required to disclose that the fraudulent activity was, in fact, still ongoing. *Id.* The Second Circuit sharply disagreed because "disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *Id.* (internal quotation marks and footnote omitted). To the contrary, by disclosing the litany of possible problems that could flow from these investigations, UBS complied with the directive of Item 105. *Id.*

Both decisions rest soundly on the text of Item 105. First, a cause of action for failing to disclose a material risk naturally requires an allegation that a known risk factor existed at the time of the offering. *Silverstrand*, 707 F.3d at 103. Second, in keeping with Item 105's call for a concise, not all-inclusive disclosure, registrants need not list speculative facts

24

or unproven allegations, even if they fit within one of the identified factors. *City of Pontiac*, 752 F.3d at 184. And the two standards reflect the outcomes. The registrant in *Silverstrand* allegedly knew that the FDA would scrutinize the reported effects of its product, a gaze that carried specific risks to their business. So allegations of failing to disclose that factor was enough to state a claim. Compare that to the filer in *City of Pontiac* who packed the proxy with a host of risks focused on the company, its practices, the problems, and the possible penalties. Asking for more, as the Second Circuit noted, would create a new obligation grounded in guesswork.

> iii.    *M&T's Disclosure in the Joint Proxy Lacks Description and Context of Its Compliance Risks*

With these parameters, the shortcomings in M&T's proxy become clear. M&T omitted company-specific detail about its compliance program. Yet M&T knew that the state of its compliance program would be subject to extensive review from federal regulators. And it understood that failure to pass regulatory scrutiny could sink the merger. Taken together, M&T had a duty to disclose more than generic information about the regulatory scrutiny that lay ahead. Instead, and contrary to the ordinary language of Item 105, it offered breadth where depth is required.

Start with the allegations about the BSA/AML compliance program. The Joint Proxy stated that "[c]ompletion of the merger . . . [is] subject to the receipt of all [regulatory] approvals," a process that includes review of "the effectiveness of the companies in combatting money laundering." (App. at A1017–18.) It noted that "we cannot be certain when or if we

will obtain [the regulatory approvals] or, if obtained, whether they will contain terms, conditions, or restrictions not currently contemplated." (App. at A1017). And, "[l]ike all businesses, M&T is subject to operational risk, which represents the risk of loss resulting from human error, inadequate or failed internal processes and systems, and external events." (App. at A0245.) Such "[o]perational risk," the Joint Proxy noted, "also encompasses reputational risk and compliance and legal risk, which is the risk of loss from violations of, or noncompliance with, laws, rules, regulations, prescribed practices or ethical standards, as well as the risk of noncompliance with contractual and other obligations." (App. at A0245.) And "[a]lthough M&T seeks to mitigate operational risk through a system of internal controls . . . , no system of controls . . . is infallible." (App. at A0246). Any "[c]ontrol weaknesses or failures or other operational risks could result in charges, increased operational costs, harm to M&T's reputation or foregone business opportunities." (App. at A0246.)

So M&T identified that the merger hinged on obtaining regulatory approval. And it singled out that determining the effectiveness of its BSA/AML program would be crucial to obtaining that approval. In fact, in "*every case* under the Bank Merger Act" the "[Federal Reserve] Board must take into consideration . . . records of compliance with anti-money-laundering laws."[12] (App. at 1083 (emphasis added).) As M&T

---

[12] Other sources similarly support this conclusion. In its 2010 BSA/AML Examination Manual, the Federal Financial Institutions Examination Council ("FFIEC") called Title III of the USA PATRIOT Act "arguably the single most significant AML law that Congress enacted since the BSA itself." FFIEC,

even noted, the Board is responsible for evaluating BSA/AML compliance under the authority of two separate statutes: Section 4 of the Bank Holding Company Act of 1956 and Section 18(c) of the Federal Deposit Insurance Act. (App. at A1018.) And so we have no difficulty concluding that the regulatory review process posed a significant risk to the merger that would make it speculative or risky. Put another way, M&T mentioned that regulatory hoops stood between the proposed merger and a final deal.

But M&T failed to discuss just how treacherous jumping through those hoops would be. Instead, M&T offered

---

Bank Secrecy Act/ Anti-Money Laundering Examination Manual 8 (2010), https://www.occ.treas.gov/static/ots/exam-handbook/ots-exam-handbook-1400.pdf.

In both the 2010 Manual and the updated 2014 Manual, the FFIEC warned that bank management "must be vigilant" in BSA/AML compliance and stated: "Banks should take reasonable and prudent steps to combat money laundering and terrorist financing and to minimize their vulnerability to the risk associated with such activities. Some banking organizations have damaged their reputations and have been required to pay civil money penalties for failing to implement adequate controls within their organization resulting in noncompliance with the BSA." *See* FFIEC, Bank Secrecy Act/ Anti-Money Laundering Examination Manual 10 (2010), https://www.occ.treas.gov/static/ots/exam-handbook/ots-exam-handbook-1400.pdf, *and* FFIEC, Bank Secrecy Act/ Anti-Money Laundering Examination Manual 6 (2015) (V2), https://bsaaml.ffiec.gov/manual.

information generally applicable to nearly any entity operating in a regulated environment. In fact, M&T said that: "[l]ike all businesses," it was subject to regulatory risk. (App. at A0245.) Contrary to Item 105's directive, M&T's explanation of the regulatory review process offered no details and no more than "[g]eneric or boilerplate discussions [that] do not [explain] . . . the risks." *Silverstrand*, 707 F.3d at 103.

Indeed, M&T's generic statement about money laundering compliance is not far from the risk statement offered in SEC guidance as *inadequate*. As recommended by the SEC's guidance, M&T should have "specifically link[ed]" its general statements to "each risk to [its] industry, company, or investment" using details that connected the pending merger review to its existing and anticipated business lines.[13] SEC Legal Bulletin No. 7, 1999 WL 34984247, at *6. But such concise and plain discussions of the significance of regulatory review, framed in the context of M&T's particular business and industry, are absent from the Joint Proxy. As a result, the Shareholders have plausibly alleged that had M&T disclosed the state of its BSA/AML program in the context of regulatory scrutiny that program would face, "there is a substantial likelihood that a reasonable shareholder would [have] consider[ed] it important in deciding how to vote."[14] *Seinfeld*,

---

[13] The only specificity on the subject appears in M&T's incorporated 2011 Annual Report stating, in sharp contrast, that it had in place "approved policies and procedures believed to comply with the USA Patriot Act." (App. at A1028.)

[14] M&T insists that even if the Proxy Statement warnings could insufficiently state the BSA/AML deficiencies,

28

461 F.3d at 369.

M&T's discussions about the problems surrounding its consumer checking practice are likewise deficient. Here, the Shareholders claim that M&T was, in fact, aware of the malpractice. The Second Amended Complaint alleges that M&T's faulty practice—first offering free checking, then switching customers to accounts carrying fees—pre-dated the merger agreement. The Joint Proxy did not mention the non-compliant practice or the company's steps to remediate the action. And unlike the BSA/AML deficiencies, M&T did not later attempt to cure its omission—even as it became aware that the merger faced indefinite delays upon learning of the regulatory investigation into the BSA/AML deficiencies. The Shareholders ask that we infer that the consumer checking practices cast doubt on M&T's controls and compliance systems, and posed an independent regulatory risk to the merger material enough that a reasonable shareholder would consider it important in deciding how to vote. On these facts, that inference is reasonable.

---

at least the "supplemental disclosures" ensured that "no reasonable shareholder would have been misled about the regulatory hurdles the merger faced." (Response Br. at 35.) But the supplemental disclosures plausibly failed to cure the defect that had already occurred given the omitted risks—both on the lateness of its release and the sufficiency of the information conveyed. Least to say, the effect of the supplemental disclosures raises an issue of fact, which precludes dismissal for now.

#### iv. *Concision is Not Clairvoyance*

M&T contends that this appeal "presents the question whether filers of stock-based merger proxies are obligated, . . . to predict regulatory action before it occurs." (Appellees' Supp. Br. at 1.) Indeed, Item 105 does not. Another regulation, Item 103, does require disclosure of potential or present litigation or regulatory enforcement. 17 CFR § 229.103. So the "risk factors" requiring disclosure under Item 105 are separate from legal risks under Item 103. But M&T's contention assumes that *only* risks that are, or later blossom into, regulatory enforcement actions require disclosure. Item 105 is not so narrowly drawn, and we cannot read a line into the law where one does not exist. *See Rotkiske v. Klemm*, 140 S. Ct. 355, 360–61 (2019) ("It is a fundamental principle of statutory interpretation that 'absent provision[s] cannot be supplied by the courts.'") (quoting Scalia & Garner, *supra*, at 94).

To be clear, we do not hold that the regulatory enforcement actions by themselves required M&T to disclose these issues.[15] Later litigation or regulatory enforcement does

---

[15] Our decision in *General Electric Co. v. Cathcart* does not aid M&T. In *Cathcart*, we held that "speculative disclosure [of potential legal claims] is not required under Section 14(a)." 980 F.2d at 935. But *Cathcart* arose from the alleged failure to disclose hypothetical future legal claims, particularly claims against individual directors and officers—not against the company itself. *Id.* at 935–36. We concluded that the defendants had no duty to disclose potential liability without pending or threatened litigation. *Id.* at 931. In doing so, we found that a reasonable shareholder would not find the

30

not create a retroactive duty to disclose. But like the defendants in *Silverstrand*, M&T knew the regulators would be looking into its compliance program, and specifically its BSA/AML effectiveness. They said so themselves. And they knew the failure to obtain regulatory approval would be significant, possibly fatal, to the merger. Yet, unlike the defendants in *City of Pontiac*, M&T offered little more than generic statements about the process of regulatory review. The Shareholders also allege that M&T knew that its consumer checking program skirted regulatory standards, as they claim M&T curtailed its misconduct shortly after signing the merger agreement. Like BSA/AML compliance, we can infer this practice posed a separate and significant regulatory risk to the merger, as personal checking is a principal business component of any

---

possibility of future claims against directors and officers to be material—as opposed to litigation against the company—unless it ripened into pending or threatened litigation. *Id.* at 936–37 (concluding that otherwise requiring General Electric to disclose potential litigation against all of its 280,000 employees would "bury the shareholders in [an] avalanche of trivial information"). And *Cathcart* distinguished its determination of materiality in the context of liability of directors and officers from materiality in the context of mergers, "in which the shareholders would understandably focus on the operation of the company as a whole." *Id.* at 937. Here, it was not the future threat of regulatory action that triggered the need for disclosure under Item 105. Rather, it was the failure to disclose the risks associated with the compliance program. It is thus plausible to conclude that a reasonable shareholder would consider the failure of M&T's internal compliance program on these issues to be a material element about the company's operations.

consumer bank. And so regulatory review of a bank's consumer checking practices as part of a merger would not be unexpected. But whether M&T had actual knowledge of the shortcomings in its BSA/AML compliance or its consumer checking practices is of no moment; it is the risk to the merger posed by the regulatory inspection itself that triggered the need for disclosures under Item 105. And the Shareholders have stated allegations that support a reasonable inference that the omission of information related to these risks was material, as evidenced by the threat to the merger caused by the pervasiveness of these deficiencies. This theory may not survive discovery, but it is enough for plaintiffs to meet their pleading burden.

As a result, the Second Amended Complaint plausibly alleges that the BSA/AML deficiencies and consumer checking practices posed significant risks to the merger before M&T issued the Joint Proxy. And based on these allegations, it's also plausible that disclosing the weaknesses present in M&T's BSA/AML and consumer compliance programs "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *EP Medsystems, Inc.*, 235 F.3d at 872 (internal quotation marks omitted). Thus, the Shareholders have met their pleading burden.

**B.    The Shareholders Allege No Misleading Opinions**

We agree with the District Court that the Shareholders failed to allege an actionably misleading opinion statement. The Supreme Court's decision in *Omnicare* provides the relevant framework, holding that an opinion statement is misleading if it "omits material facts" about the "inquiry into

32

or knowledge concerning a statement of opinion." 575 U.S. at 189. But liability attaches only "if those facts conflict with what a reasonable investor would take from the statement itself." *Id*. Alleging an actionable claim under this theory "is no small task," *id.* at 194, because a reasonable investor "understand[s] that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion."[16] *Id.* at 189–90.

The Shareholders' allegations do not meet this rigorous benchmark. First, they point to M&T's opinion on when it believed the merger might close and the state of its BSA/AML compliance program in its 2011 Annual Report.[17] The

---

[16] We have not considered whether *Omnicare* applies to claims brought under the Exchange Act and under Section 14(a). But it is unnecessary to resolve that question here. Even assuming *Omnicare*'s holding applies, the Shareholders have failed to allege an actionably misleading opinion.

[17] The Joint Proxy states that "[a]lthough we currently *believe* we should be able to obtain all required regulatory approvals in a timely manner, we cannot be certain when or if we will obtain them or, if obtained, whether they will contain terms, conditions or restrictions not currently contemplated that will be detrimental to or have a material adverse effect on M&T or its subsidiaries after the completion of the merger." (App. at A1009 (emphasis added); *see also* App. at A1017).) It adds "[t]he Registrant and its impacted subsidiaries have approved policies and procedures that are *believed* to be

33

Shareholders argue both are misleading because the opinions turned out to be wrong. But *Omnicare* rejected that premise, holding "a[] [plaintiff] cannot state a claim by alleging only that an opinion was wrong . . . ." 575 U.S. at 194. As there is no allegation that M&T offered an insincere opinion, it "is not an untrue statement of material fact, regardless [of] whether an investor can ultimately prove the belief wrong." *Id.* at 186 (internal quotation marks omitted).

Second, the Shareholders allege the Joint Proxy omitted facts about the process M&T followed to form its opinions. They allege, again in conclusory fashion, that M&T and Hudson acted negligently in reviewing M&T's compliance program. The Second Amended Complaint alleges that while "M&T conducted intensive due diligence" of Hudson "from June 2012 through August 27, 2012," by contrast, Hudson did not begin its "reverse due diligence" until August 20, 2012, which lasted "at most five business days." (App. at A0935.) These efforts, the Shareholders allege, were not enough, and show that the opinion statements were insufficient. But the Shareholders omit particular facts about the banks' conduct.

To begin, the Joint Proxy disclosed the duration of the due diligence efforts. "[T]o avoid exposure for omissions," a speaker "need only divulge an opinion's basis, or else make clear the real tentativeness of its belief." *Omnicare*, 575 U.S. at 195. Thus, even if a reasonable investor would have expected the banks to conduct diligence over a longer period, the Joint Proxy provided enough information to understand what the banks did, information enough to decide how to vote.

___

compliant with the USA Patriot Act." (App. at A1028 (emphasis added).)

34

And, in any event, general allegations of negligence do not suffice. *See id.* at 195–96. In all, the opinions flowed from the Joint Proxy's description of the increased scrutiny across the industry. Cautionary language surrounds the opinions, warning of the uncertainty of projections about regulatory approval. Under *Omnicare*, these opinions inform, rather than mislead, a reasonable investor. And so we will affirm the District Court's dismissal of the Shareholders' misleading opinion claims.

## IV. CONCLUSION

We conclude with caveats, cautions, and qualms. First, that the Shareholders have adequately pleaded facts that, if true, might warrant remedy naturally says nothing at this stage of the litigation about their ultimate truth. Second, that M&T might have pursued different choices managing its business is not the focus of our decision. Rather, it is that M&T had an obligation to speak concisely about the risks surrounding their plans.

Finally, our application of now well-established principles of securities fraud class actions does not alleviate our worry over the many well-argued doubts about these kinds of aggregate claims. *See*, *e.g.*, John C. Coffee, Jr., Reforming the Securities Class Action: An Essay on Deterrence and Its Implementation, 106 Colum. L. Rev. 1534, 1536 (2006) (explaining "class actions produce wealth transfers among shareholders that neither compensate nor deter"). Despite reams of academic study, steady questions from the courts, and periodic Congressional attention, the number of securities class

actions continues to rise each year.[18] Whether that tide represents an efficient current or "muddled logic and armchair economics," *Halliburton,* 573 U.S. at 297 (Thomas, J., concurring), is the sort of question that deserves a more searching inquiry. In the meantime, we will affirm the District Court's dismissal of the Shareholders' claims that M&T made misleading opinion statements, and vacate the dismissal of the claims about M&T's risk disclosure obligations.

---

[18] "Since 2012, securities-fraud suits have steadily increased each year; most recently, there was a 7.5% year-over-year increase in 2016 and an additional 15.1% jump in 2017." Congress, the Supreme Court, and the Rise of Securities-Fraud Class Actions, 132 Harv. L. Rev. 1067, 1070 (2019) (citing Cornerstone Research, Securities Class Action Filings: 2017 Year in Review 39 (2018)).