PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No: 20-1843
_____

ABNER ANTONIO ARCOS SANCHEZ,
a/k/a Abner Arcos, a/k/a Abner Sanchez,
a/k/a Abner A. Snachez-Acros, a/k/a Abner Antonio
Acros-Sanchez,

Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(BIA 1:A204-362-439)
Immigration Judge: Mirlande Tadal
_____

Argued: January 26, 2021

Before:   JORDAN, MATEY, *Circuit Judges,*
and HORAN,* *District Judge.*

(Filed: May 5, 2021)

_____

Jerard A. Gonzalez [ARGUED]
BASTARRIKA SOTO GONZALEZ & SOMOHANO
3 Garret Mountain Plaza - Suite 302
Woodland Park, NJ 07424

Cheryl Lin
338 Palisade Avenue - Suite 255
Jersey City, NJ 07307
        *Counsel for Petitioner*

William P. Barr
Micah Engler
Brendan P. Hogan [ARGUED]
UNITED STATES DEPARTMENT OF JUSTICE
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
        *Counsel for Respondent*

_____

OPINION OF THE COURT

_____

* Honorable Marilyn Horan, United States District Judge for the Western District of Pennsylvania, sitting by designation.

_____

HORAN, *District Judge*.

Abner Antonio Arcos Sanchez petitions for review of the Board of Immigration Appeals' ("Board") decision dismissing his appeal of an Immigration Judge's ("IJ") denial of his application for asylum, withholding of removal under 8 U.S.C. § 1231(b)(3), and withholding of removal under the Convention Against Torture ("CAT"). The Board also denied Arcos Sanchez's request for remand to the IJ for administrative closure, which would have given time for renewal of his Deferred Action for Childhood Arrivals ("DACA") status. On this latter issue, the Board cited then Attorney General Sessions' decision in *Matter of Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018). The Board determined that the IJ and the Board did not have authority to administratively close proceedings, unless a regulation or a previous judicially approved settlement expressly authorizes such an action" as set forth in *Castro-Tum*. A.R. 4. As such, remand for consideration of administrative closure, while Arcos Sanchez pursued DACA status renewal, was denied. For the reasons we discuss below, we grant Arcos Sanchez's petition for review, vacate the Board's decision, and remand for proceedings consistent with this opinion.

## I.    Facts and Procedural History

In 2002, at the age of seven, Arcos Sanchez, a native and citizen of Mexico, entered the United States without

inspection. In 2012, he applied for DACA[1] status, which was approved. The Department of Homeland Security periodically granted his requests for renewals. On April 8, 2019, Arcos Sanchez was arrested and charged in New Jersey with sexual assault and endangering the welfare of a child. On May 17, 2019, based upon that arrest and those charges, the United States Citizenship and Immigration Services ("USCIS") revoked Arcos Sanchez's DACA status. In June 2019, the

---

[1] Since June 15, 2012, DACA has granted certain immigrant children and young adults deferred action, a form of prosecutorial discretion where the Department of Homeland Security ("DHS") formally decides not to pursue removal of otherwise deportable non-citizens. *See* DHS, Memorandum from Sec'y of Homeland Sec. Janet Napolitano, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf, Addendum A ("Napolitano Memorandum"). To be considered for DACA, applicants must satisfy the requirements set forth in the Napolitano Memorandum. Specifically, the applicant must: 1. Have entered the United States under the age of 16; 2. Have continuously resided in the United States since June 15, 2007; 3. Be currently enrolled in school, have graduated from high school, have obtained a general education development certificate, or have been honorably discharged from the U.S. Coast Guard or Armed Forces; 4. Have not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or are otherwise not a threat to national security or public safety; and 5. Have been under the age of 30 as of June 5, 2012. Napolitano Memorandum at 1.

Department of Homeland Security took Arcos Sanchez into custody, served him with a Notice to Appear, and charged him as being present without having been admitted or paroled. *See* 8 U.S.C. § 1182(a)(9)(B)(ii).

In removal proceedings before the IJ, Arcos Sanchez applied for asylum, withholding of removal, and for relief under CAT. The IJ denied asylum, finding that Arcos Sanchez failed to meet the one-year filing deadline or show extraordinary circumstances in the delay. The IJ denied withholding of removal, finding the proposed social group was not cognizable. Finally, the IJ denied his CAT claim, finding he did not demonstrate at least a fifty percent chance he would be tortured upon his return to Mexico. On November 6, 2019, the IJ issued his decision and ordered Arcos Sanchez's removal to Mexico. Two weeks later, his state criminal charges were dismissed.

On appeal to the Board, Arcos Sanchez challenged the IJ's decision and requested the Board remand his case to the IJ for consideration of administrative closure. He argued that, because the state criminal charges were dismissed, he was "eligible for renewal of his DACA and re-filed with UCIS on January 28, 2020[,]" which would impact the disposition of his removal proceeding. A.R. 26. The Board denied remand, citing the binding precedent of then-Attorney General Sessions' *Castro-Tum* decision, which held that, under the regulations governing the Executive Office of Immigration Review, IJs and the Board do not have the general authority to indefinitely suspend immigration proceedings by administrative closure. The Board found that, since Arcos Sanchez did not show that his request for remand for administrative closure fell within the express exceptions under

5

*Castro-Tum*, his case could not be administratively closed.  27 I. & N. Dec. at 283.[2]  Arcos-Sanchez petitioned for review of the Board's decision.

## II.    Jurisdiction

We have jurisdiction to review petitions under 8 U.S.C. § 1252(a).  We review legal conclusions of the Board de novo, subject to established rules of deference.  *Da Silva v. Att'y Gen. of the U.S.*, 948 F.3d 629, 633 (3d Cir. 2020).  Here, we are presented with the question whether then Attorney General Sessions' *Castro-Tum* decision properly concluded that 8 C.F.R. §§ 1003.1(d)(1)(ii) and 1003.10(b) unambiguously do not grant IJs and the Board the general authority to administratively close cases.  The Board denied  Arcos Sanchez's remand request based on the Attorney General's conclusion that there is no such general authority.  Arcos Sanchez challenges the Board's reliance on that conclusion, which we will review de novo.  *See Da Silva,* 948 F.3d at 633.

## III.   History of Administrative Closure

### A.    Pre *Castro-Tum*

Since at least the 1980s, IJs and the Board have utilized administrative closure as a docketing tool to remove cases from their active dockets as a matter of "administrative

---

[2] As noted below, the Department of Justice amended 8 C.F.R. §§ 1003.1(d)(1)(ii) and 1003.10(b) for removal proceedings initiated after January 15, 2021.  As this matter was initiated before January 15, 2021, the Court reviews the pre-amendment text.

6

convenience." *In re Gutierrez-Lopez*, 21 I. & N. Dec. 479, 480 (B.I.A. 1996) (internal quotation marks omitted); *see also Matter of Amico*, 19 I. & N. Dec. 652, 654 n.1 (B.I.A. 1988) ("The administrative closing of a case does not result in a final order," but "is merely an administrative convenience which allows the removal of cases from the calendar in appropriate situations."). Administrative closure allows an IJ or the Board to "temporarily pause removal proceedings" and place the case on hold because of a pending alternative resolution or because events outside the control of either party may affect the case. *Matter of W-Y-U-*, 27 I. & N. Dec. 17, 18 (B.I.A. 2017).

Even though IJs and the Board have used general administrative closure for almost three decades, the Immigration and Naturalization Act ("INA") and the regulations governing IJs or the Board do not expressly authorize the practice. *See Vahora v. Holder*, 626 F.3d 907, 917-18 (7th Cir. 2010) (noting that the general power to administratively close a case is employed by quasi-judicial bodies for "orderly management of the docket" and is reviewable by courts). Although the INA and its regulations do not specifically reference general administrative closure authority, the regulations both explicitly and implicitly confer broad powers on IJs and the Board to manage their dockets. As regards IJs' authority, 8 C.F.R. § 1003.10(b) concerns their "powers and duties" and states in relevant part:

> In conducting hearings under section 240 of the Act and such other proceedings the Attorney General may assign to them, immigration judges shall exercise the powers and duties delegated to them by the Act and by the Attorney General through regulation. In deciding the individual

7

cases before them, and subject to the applicable governing standards, immigration judges shall exercise their independent judgment and discretion and may take *any action* consistent with their authorities under the Act and regulations that is *appropriate and necessary* for the disposition of such cases. ... In all cases, immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the Act and regulations.

*Id.* (emphases added). In addition, 8 C.F.R. § 1240.1(a)(iv) provides that IJs shall have the authority in any removal proceeding to "take any other action consistent with applicable law and regulations as may be appropriate." As regards the Board's authority, 8 C.F.R. § 1003.1(d)(1)(ii) states that Board members:

shall exercise their independent judgment and discretion in considering and determining the cases coming before the Board, and a panel or Board member to whom a case is assigned may take *any action* consistent with their authorities under the Act and the regulations *as is appropriate and necessary* for the disposition of the case.

*Id.* (emphases added).

Aside from regulations, Board decisions have also recognized the authority for IJs and the Board to administratively close cases, at first only if it was not "opposed by either of the parties." *Matter of Gutierrez-Lopez*, 21 I. & N.

8

Dec. at 479. In *Matter of Avetisyan*, the Board endorsed the administrative closure practice and held that both 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii) empower IJs and the Board to "take any action…as is appropriate and necessary for the disposition of [a] case." 25 I. & N. Dec. 688, 691 (B.I.A. 2012). The Board applied a six-factor test to determine whether administrative closure was appropriate, regardless of government opposition. *See Avetisyan*, 25 I. & N. Dec. at 696. It explained that, "[d]uring the course of proceedings, an [IJ] or the [Board] may find it necessary or, in the interests of justice and fairness to the parties, prudent to defer further action for some period of time." *Id.* The Board described two mechanisms to defer action: continuance and administrative closure. "[A] continuance may be appropriately utilized to await additional action required of the parties that will be, or is expected to be, completed within a reasonably certain and brief amount of time." *Id.* However, the Board observed in *Avetisyan* that when the parties must "await an action or event that is relevant to immigration proceedings but is outside the control of the parties or the court and may not occur for a significant or undetermined period of time," removing a case from the docket via administrative closure may be "appropriate." *Id.* at 692.

In addition, as described by the Board, administrative closure can facilitate "efficient management of the resources of the immigration courts and the Board." *Id.* at 695; *see also Gonzalez-Caraveo v. Sessions*, 882 F.3d 885, 889-90 (9th Cir. 2018) (citing *Matter of Avetisyan* as authority for administrative closure). Under this framework, the Board has issued decisions recognizing the authority for IJs to administratively close cases for many reasons related to the interests of justice or to the conservation of court resources.

9

*See e.g. Matter of Montiel*, 26 I. & N. Dec. 555 (B.I.A. 2015) (holding administrative closure appropriate when a petitioner is awaiting resolution of a criminal conviction direct appeal). The Board reaffirmed *Avetisyan* in *Matter of W-Y-U-*, and clarified that "the primary consideration for an Immigration Judge in determining whether to administratively close or recalendar proceedings is whether the party opposing administrative closure has provided a persuasive reason for the case to proceed and be resolved on the merits. 27 I. & N. Dec. at 20.

## B. *Castro-Tum*

On May 17, 2018, in *Matter of Castro-Tum*, then Attorney General Sessions employed administrative adjudication under 8 C.F.R. § 1003.1(h)(1)(i), holding that IJs and the Board lack the authority to administratively close cases "except where a previous regulation or settlement agreement has expressly conferred it." 27 I. & N. Dec. at 283. In that decision, the Attorney General overruled the contrary rulings from *Avetisyan* and *W-Y-U-.* This decision reversed the decades-old practice of administrative closure, endorsed by Board decisions and rooted in prior interpretations of 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii). The Attorney General noted a sharp increase in administratively closed cases between 2011 and 2017, which he linked to the more permissive standard established by *Avetisyan*. *Id.* at 273. And he observed that no statute or regulation explicitly grants IJs a general power of administrative closure. In concluding that the regulations do not implicitly grant authority for administrative closure, he held that closure cannot be "appropriate and necessary" to the "disposition" of cases since closure is a suspension that delays the final resolution of a case. *Id.* at 285.

He further reasoned that a general power to administratively close cases would conflict with the regulation's requirement that IJs "timely" resolve their cases. *Id.*

### C. Post *Castro-Tum*

Since the issuance of *Castro-Tum*, our sister courts of appeals have split on whether it was correctly decided. The Fourth and Seventh Circuits have ruled that the IJ and Board have general authority to administratively close cases. In *Romero v. Barr*, the Fourth Circuit analyzed the regulations at issue and concluded that they "unambiguously confer upon IJs and the Board the general authority to administratively close cases[,]" but even if they are ambiguous, "the Attorney General's reading of the regulations does not warrant deference because it amounts to an 'unfair surprise.'" 937 F.3d 282, 294-95 (4th Cir. 2019). Similarly, in *Meza Morales v. Barr*, the Seventh Circuit concluded that *Castro-Tum* was contrary to the unambiguous meaning of the regulations and that IJs and the Board are "not precluded from administratively closing cases when appropriate." 973 F.3d 656, 667 (7th Cir. 2020) (Barrett, J.); *see also Zelaya Diaz v. Rosen*, 986 F.3d 687 (7th Cir. 2021) (applying *Meza-Morales*). Thus, two circuits have concluded that the regulations at issue unambiguously confer general authority for administrative closure and that *Castro-Tum* was wrongly decided. On the other hand, in *Hernandez-Serrano v. Barr*, the Sixth Circuit held that the regulations unambiguously do not authorize the general use of administrative closure and that *Castro-Tum* was correctly decided. 981 F.3d 459 (6th Cir. 2020). That court held that §§ 1003.10 and 1003.1(d) do not delegate to IJs or the Board

"the general authority to suspend indefinitely immigration proceedings by administrative closure."[3]  *Id.* at 462.

## IV.    Discussion

Arcos Sanchez argues that 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii) unambiguously grant IJs and the Board the general authority to administratively close cases by authorizing them to take "any action" that is "appropriate and necessary" for the disposition of cases.  As such, Arcos Sanchez maintains that *Castro-Tum* was wrongly decided, and that the Board's decision should be vacated and remanded so that he may seek administrative closure before the IJ.   His position reflects the rulings of the Fourth and Seventh Circuits.

The government, on the other hand, argues that the Board was correct to apply *Castro-Tum*, because the unambiguous text of the regulations does not confer general authority for administrative closure.  This position tracks the ruling of the Sixth Circuit.  In the alternative, the government argues that, if we should find the regulations are ambiguous, then we should defer to *Castro-Tum*.  In either case, the government asks us to uphold the Board's decision denying

---

[3] On December 16, 2020, the Executive Office of Immigration Review within the Department of Justice issued a final rule, endorsing the Sixth Circuit's position on *Castro-Tum* and codifying the Attorney General's decision on administrative closure.  Appellate Procedures and Decisional Finality in Immigration Proceedings; Administrative Closure, 85 Fed. Reg. 81588-01 (December 16, 2020).  This rule took effect on January 15, 2021 and is not retroactive to this case. *Id.*

Arcos Sanchez's request for remand for administrative closure. We will now address the issue of the general authority of IJs and the Board to administratively close cases.

Our consideration of the regulations, and in turn *Castro-Tum*, begins with review of the language of 8 C.F.R. §§ 1003.1(d)(1)(ii) and 1003.10(b) to determine whether those regulations are ambiguous as regards any general authority for administrative closure. "The basic tenets of statutory construction apply to construction of regulations." *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne*, 497 F.3d 337, 351 (3d Cir. 2007). "If a statute or rule is unambiguous, we must give effect to its plain meaning." *Consol Pa. Coal Co., LLC v. Fed. Mine Safety & Health Review Comm'n*, 941 F.3d 95, 104 (3d Cir. 2019) (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019)). In *Kisor*, the Supreme Court admonished that "hard interpretive conundrums, even relating to complex rules, can often be solved" without "wav[ing] the ambiguity flag." 139 S. Ct. at 2415. Indeed, a statute or rule cannot be "genuinely ambiguous" unless it remains unclear after we have "exhaust[ed] all the 'traditional tools' of construction." *Id.* Consequently, our analysis proceeds by "'carefully consider[ing]' the text, structure, history, and purpose" of the statute or regulation. *Id.* (citation omitted).

In that regard, the Fourth Circuit in *Romero* applied the standard tools of interpretation by first reading the text of the relevant regulations. Both regulations provide that IJs and the Board "may take any action ... appropriate and necessary for the disposition" of the case. 8 C.F.R. §§ 1003.1(d)(1)(ii) & 1003.10(b). In assessing the word "any" for its plain meaning, *Romero* opined, "'*any* action ... for the disposition of' the case is read most naturally to encompass actions of whatever kind

13

appropriate for the resolution of a case." 937 F.3d at 292 (citation omitted) (emphasis added). The Fourth Circuit concluded,[4] and we agree, "this would plainly include docket management actions such as administrative closure, which often facilitate…case resolution." *Id.* Second, *Romero* observed, and we agree, that administrative closure qualifies as an "action" under §§ 1003.10(b) and 1003.1(d)(1)(ii). In fact, the *Castro-Tum* decision describes administrative closure as an action. 27 I. & N. Dec. at 271. Third, *Romero* noted the only limitation upon "any action" within the text of §§ 1003.10(b) and 1003.1(d)(1)(ii) "is that the circumstances be 'appropriate

---

[4] *Romero v. Barr*, 937 F.3d 282 (4th Cir. 2019), bolstered its conclusion by comparing these regulations to the plain meaning afforded the word "any" in other statutes or regulations. *See, e.g.*, *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 220 (2008) (concluding that "any…other law enforcement officer" means "law enforcement officers of whatever kind"); *Massachusetts v. EPA*, 549 U.S. 497, 529 (2007) (repetition of "any" embraced all airborne compounds); *Brogan v. United States*, 522 U.S. 398, 400 (1998) ("any" false statement included a false statement "of whatever kind"); *United States v. Gonzales*, 520 U.S. 1, 5 (1997) (concluding that the inclusion of the word "any" and the lack of restrictive language left no basis for limiting a provision in a sentencing statute); *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 589 (1980) (concluding Congress intended "any" as "expansive language"); *Citizens' Bank of La. v. Parker*, 192 U.S. 73, 81, (1904) ("The word *any* excludes selection or distinction. It declares the exemption without limitation."); *Int'l All. of Theatrical & Stage Emps. v. NLRB*, 334 F.3d 27, 34 (D.C. Cir. 2003) (noting that the use of "any" signals that the word it modifies should receive broad definition).

and necessary' for IJs and the [Board] to administratively close a case." 937 F.3d at 293. Specifically, this clause requires that any action taken must be appropriate and necessary for the disposition of each case consistent with authorities under the Act and regulations. Precedent shows that the phrase "appropriate and necessary" is treated broadly. *Id.* (citing *Michigan v. EPA*, 576 U.S. 743, 752 (2015) ("One does not need to open up a dictionary in order to realize the capaciousness of this phrase ['appropriate and necessary'].")); *see also Sossamon v. Texas*, 563 U.S. 277, 286 (2011) (noting "the word 'appropriate' is inherently context dependent"); *Armour & Co. v. Wantock*, 323 U.S. 126, 129-30 (1944) (concluding the word "necessary … has always been recognized as a word to be harmonized with its context"). We similarly conclude that the use of the phrase "disposition of … case" relates to the context-driven phrase "appropriate and necessary." Board decisions have illustrated the many contexts in which administrative closure is "appropriate and necessary."[5] Thus, the limiting words "appropriate and

---

[5] *See Matter of Avetisyan*, 25 I. & N. Dec. 688 (B.I.A. 2012) (administrative closure granted pending visa petition on adjustment of status); *Matter of Rajah*, 25 I. & N. Dec. 127, 135 n.10 (B.I.A. 2009)(administrative closure granted pending prima facie approvable of visa petition); *Matter of Hashmi*, 24 I. & N. Dec. 785, 791 n.4 (administrative closure granted pending application for provisional waiver ); *see also* 8 C.F.R. § 212.7(e)(4)(iii) (DHS regulation requiring individuals in removal proceedings to have the proceedings administratively closed prior to applying for a provisional waiver). Nothing in § 1003.10 or § 1003.1(d)(1)(ii) suggests any limiting parameters on what may be considered "appropriate and necessary."

necessary" instruct that any action taken by the IJ or the Board must consider case-specific circumstances.

Finally, *Romero* noted, and we agree, that "the rest of the text of the relevant regulations supports the conclusion that IJs and the [Board] possess broad discretion in how to manage their cases." 937 F.3d at 294. As for IJs, § 1003.10(b) concludes, "[i]n all cases, immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the Act and regulations." As for the Board, § 1003.1(d)(1) likewise provides that "[t]he Board shall resolve the questions before it in a manner that is timely, impartial, and consistent with the Act and regulations." We agree with *Romero* that "administrative closure may—contrary to the Attorney General's argument in *Castro-Tum*, 27 I. & N. Dec. at 288–89—in fact facilitate the timely resolution of an issue or case." 937 F.3d at 294. Indeed, as the Seventh Circuit stated in *Meza Morales*, "not all mechanisms that lengthen the proceedings of a case prevent 'timely' resolution." *Meza Morales*, 973 F.3d at 665.

In an opinion by now-Justice Amy Coney Barrett, the Seventh Circuit concluded in *Meza Morales* that "the immigration regulations that grant immigration judges their general powers [are] broad enough to implicitly encompass that [administrative closure] authority." *Id. Meza Morales* cited the example given by the Fourth Circuit in *Romero* of when "appropriate and necessary actions" could include administrative closure: "cases in which two coordinate offices in the executive branch are simultaneously adjudicating collateral applications [and] closing one proceeding might help advance a case toward resolution." *Id.* (citing *Romero*, 937 F.3d at 293). And it rejected the Government's arguments,

16

such as that other regulatory provisions would be rendered superfluous or that delays caused by administrative closure are forbidden by the regulations. The opinion concludes that the regulatory preference for timeliness "is not a hard and fast deadline; some cases are more complex and simply take longer to resolve," and therefore that preference "doesn't justify departure from the plain text of the rule." *Id.* at 665. In the end, "[e]xpeditiousness may be one … goal [of the regulations], but it is not the only goal." *Id.* at 666.

We are fully persuaded that, as discussed in *Romero* and *Meza Morales*, the regulations afford IJs and the Board authority to take *any action* (including administrative closure) as is *appropriate and necessary* (in the context of each case) for the *disposition of such case* to resolve questions in a *timely and impartial manner* consistent with the Act and regulations. After applying the standard tools of interpretation, by considering the text, structure, history, and purpose of 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii), we hold that the plain language establishes that general administrative closure authority is unambiguously authorized by these regulations.

Yet, the government argues that the very same regulations unambiguously do not confer general authority for administrative closure.[6] In *Castro-Tum*, the Attorney General

---

[6] Our dissenting colleague similarly contends that the regulations do not empower IJs or the BIA to administratively close cases. The disagreement here, however, seems to be directed at how broadly those regulations were interpreted and applied prior to *Castro-Tum*, under the standard set out in *Avetisyan*, rather than at the correctness of *Castro-Tum* itself. (*See* Dissent at 10 ("But those phrases, broad or not, are

17

said as much and noted that, "[a]lthough described as a temporary suspension" of removal proceedings, "administrative closure is effectively permanent in most instances." 27 I. & N. Dec. at 272. He reasoned that the regulations do not confer general administrative authority because such action effectively amounts to an indefinite suspension that delays or prevents the final disposition of a case and thus conflicts with regulations requiring IJs to timely resolve cases. 27 I. & N. at 285. The Sixth Circuit majority in *Hernandez-Serrano* agreed with *Castro-Tum* and affirmed its conclusion that the regulations do not confer general authority for administrative closure.

---

not best understood to render section 1003.10(b) without limitation and provide IJs nearly unfettered discretion. To the contrary, 'appropriate and necessary' is itself an important restriction on the scope of the Attorney General's delegation, and one that comes with some bite.").) To that end, the dissent criticizes our example of an immigration adjudication prevented by the shuttling of a file back and forth between USCIS and the Office of Chief Counsel, calling such evidence "too light a breeze to propel a vast delegation of general administrative closure authority." (Dissent at 15.) But the question before us is not whether the regulations endow IJs and the BIA with a "vast delegation of general administrative closure authority." It is whether they entirely foreclose IJs or the BIA from ever exercising some degree of discretion to administratively close a case, as the Attorney General decided in *Castro-Tum*. Thus, the dissent's characterization of "administrative closure" as "the antithesis of a final disposition" does not convince us that *Castro-Tum* was correctly decided. (Dissent at 7 (quoting *Castro-Tum*, 27 I. & N. Dec. at 285).

18

Both *Castro-Tum* and *Hernandez-Serrano* emphasize a concern that administrative closure leads to delay or no final decision in removal cases. In fact, the opening sentence of the *Hernandez-Serrano* majority opinion states: "[a] regulation delegating to immigration judges authority to take certain actions '[i]n deciding the individual cases before them' does not delegate to them general authority not to decide those cases at all." 981 F.3d at 461. That court also observed, "[t]hus the reality is that, in hundreds of thousands of cases, administrative closure has amounted to a decision not to apply the Nation's immigration laws at all." *Id.* at 463. Concern about administrative closures causing widespread delay and non-decision appears to have motivated both the Attorney General's and the Sixth Circuit's decisions. If IJs are abusing their discretion, that may very well be cause for concern, but it does not relate to the question that *Castro Tum* purported to answer—whether the regulations confer general authority for administrative closure. The majority in *Herandez-Serrano* even conceded that "the 'timely manner' language is hortatory," but concluded that "the IJ can resolve neither questions nor a case once it is administratively closed." *Id.*

To this same point, the dissent observed, and we agree:

> whether immigration courts have granted administrative closure too frequently, and have failed to reopen administratively closed cases too often, is of no significance to the question of whether *Castro-Tum* wrongly held that IJs and the BIA never have the discretion to decide that administrative closure is "appropriate and

19

necessary for the disposition" of immigration cases.

981 F.3d at 471. The authority to administratively close cases, within the appropriate and necessary context of each case, can and does permit IJs and the Board to answer the questions before them in a timely and impartial manner consistent with the Act and the regulations. Or in other words, delay in the case through administrative closure does not, by definition, prevent the timely disposition of the case and resolution of questions.

As discussed above, certain removal cases require resolution of questions that depend upon decisions from other tribunals or agencies over which neither the IJ nor the Board controls. The Attorney General's *Castro-Tum* decision fails to acknowledge the fact that allowing time for the IJ or the Board to receive the outcome from another tribunal or agency enables resolution of relevant questions and thus facilitates the timely disposition of a removal case. Without the general authority to administratively close appropriate cases when necessary, the IJs and the Board may not have a sufficiently developed record and may be less effective in managing cases. Such a result is not contemplated by the Act or the regulations.

That some IJs and the Board may have used, or misused, administrative closure to unduly delay or permanently close and not decide cases does not answer the legal question of whether IJs or the Board have the general authority to administratively close cases under the regulations. Improper use of administrative closure to attain objectives not authorized by the regulations is appropriately challenged and redressed through appropriate review, including judicial review under an

20

abuse-of-discretion standard. *See Vahora*, 626 F.3d at 917 (review of administrative closure under an abuse of discretion standard).

In addition, the INA grants the Attorney General rulemaking authority to set standards for immigration judges and the Board. 8 U.S.C. § 1103(g)(2). Indeed, 8 C.F.R. § 1003.10(b) empowers IJs to exercise independent judgment and discretion in their decision making, "subject to the applicable governing standards" and other regulatory constraints. *Id.* As such, concern for undue delay or non-decision in removal dispositions through the application of that discretion, to the extent not already addressed through the existing regulatory framework, can be redressed through agency rulemaking and standards. "The Attorney General may amend these rules through the proper procedures. But he may not, 'under the guise of interpreting a regulation, ... create de facto a new regulation' that contradicts the one in place." *Meza Morales*, 973 F.3d at 667 (citation omitted). And, even if a regulation leads to bad policy, we "may not do the Attorney General's work for him."[7] *Hernandez-Serrano*, 981 F.3d at 474 (Clay, J., dissenting).

---

[7] The government submitted an argument in the alternative that, if the regulations were found to be ambiguous to the question of general administrative authority to administratively close immigration cases, then principles of agency deference should be afforded to apply the agency interpretation as presented in the *Castro-Tum* decision. However, this appeal is resolved by our finding that the regulations unambiguously grant general authority for IJs and the Board to administratively close immigration cases. No issue of any deference remains for discussion or decision.

21

## V. Conclusion

For the reasons stated above, we conclude that the relevant regulations confer the general authority to administratively close cases to IJs and the Board. We therefore grant the petition for review, vacate the Board's order, and remand for proceedings consistent with this opinion.

MATEY, *Circuit Judge*, dissenting.

For years, immigration judges ("IJs") and the Board of Immigration Appeals ("BIA") have used administrative closure to pause removal proceedings and place immigration cases on indefinite hold. The Attorney General ended that practice in 2018. *See generally Matter of Castro-Tum*, 27 I. & N. Dec. 271 (A.G. 2018).

Abner Antonio Arcos Sanchez argues that the Attorney General is wrong. Longstanding regulations, he complains, authorize IJs and the BIA to take "any action" that is "appropriate and necessary." But Arcos Sanchez reads only half the sentence. IJs, and the BIA, may take "any action . . . appropriate and necessary *for the disposition of [their] cases*." 8 C.F.R. § 1003.10(b) (emphasis added); *id.* § 1003.1(d)(1)(ii). And the authority to "dispose" of immigration cases does not include permission to delay a decision forever. So I respectfully dissent.

## I. THE HISTORY OF ADMINISTRATIVE CLOSURE

I begin with the history informing the Attorney General's decision in *Matter of Castro-Tum*, and agree with the majority that administrative closure is a "decades-old practice . . . endorsed by Board decisions and rooted in prior interpretations of [the governing regulations]." Maj. Op. at 10. But I read that history to show shallow foundations for allowing what is prohibited by the best reading of the regulations.

## A.    Unclear Origins

Modern administrative practices often have hazy heritages, and immigration administrative closure is no exception. Regulations dating to the 1950s granted "special inquiry officers," the predecessors to IJs, and the BIA, the authority to act as "appropriate and necessary for the disposition of" their cases. 23 Fed. Reg. 2670, 2671 (Apr. 23, 1958); 23 Fed. Reg. 9115, 9117 (Nov. 26, 1958). But while BIA opinions over the next two decades sometimes noted this language, *see, e.g.*, *Matter of Manneh*, 16 I. & N. Dec. 272, 272–73 (B.I.A. 1977), "there is little if any record of immigration cases being administratively closed," *Hernandez-Serrano v. Barr*, 981 F.3d 459, 464 (6th Cir. 2020). Instead, by all accounts, immigration administrative closure arrived in a 1984 memo from the Chief Immigration Judge advising IJs that they could order closure in *in absentia* cases.[1] Perhaps foreshadowing this case, the memo cited no authority.

The BIA's published administrative closure jurisprudence began soon after, and was similarly silent about

---

[1] *See* Memorandum to All Immigration Judges from William R. Robie, Chief Immigration Judge, Executive Office for Immigration Review, *Operating Policy and Procedure 84-2: Cases in Which Respondents/Applicants Fail to Appear for Hearing* 1 (Mar. 7, 1984); *see also* Elizabeth Montano, *The Rise and Fall of Administrative Closure in Immigration Courts*, 129 Yale L.J. Forum 567, 570 (2020) (stating that "[t]he practice of administrative closure began in the 1980s based on a Department of Justice (DOJ) memorandum that listed administrative closure as an option available to immigration judges when a person failed to appear at a hearing").

any statutory or regulatory foundations. As the Attorney General later explained, the decisions "assumed without explanation that immigration judges and the Board possessed this general authority." *Matter of Castro-Tum*, 27 I. & N. Dec. at 275. In *Matter of Amico*, the BIA described administrative closure as simply "an administrative convenience." 19 I. & N. Dec. 652, 654 n.1 (B.I.A. 1988). So too in *Matter of Lopez-Barrios*, 20 I. & N. Dec. 203, 204 (B.I.A. 1990) and *Matter of Munoz-Santos*, 20 I. & N. Dec. 205, 207 (B.I.A. 1990). The BIA reaffirmed that view in 1996 in *Matter of Gutierrez-Lopez*, 21 I. & N. Dec. 479, 479 (B.I.A. 1996). Then, silence, and the BIA did not examine administrative closure again for over a decade. Elizabeth Montano, *The Rise and Fall of Administrative Closure in Immigration Courts*, 129 Yale L.J. Forum 567, 571 (2020). "Thus, by all appearances, administrative closure was simply a device created by the IJs themselves[.]" *Hernandez-Serrano*, 981 F.3d at 464 (internal quotation marks and citation omitted).

## B. Circumscribed Regulatory Adoption

That conclusion matches the evolution of the regulatory guidance. Until the late 1990s, Department of Justice ("DOJ") regulations did not mention administrative closure. *Matter of Castro-Tum*, 27 I. & N. Dec. at 276. In 1998, the Attorney General formally acknowledged the growing practice, promulgating regulations narrowly allowing administrative closure in specific circumstances. For example, 8 C.F.R. § 1245.13(d)(3)(i) mandated administrative closure in removal proceedings involving certain Nicaraguan or Cuban nationals. Other targeted rules followed between 1999 and 2003. *See, e.g.*, 8 C.F.R. §§ 1240.62(b)(1)–(2), 1240.70(f)–(h) (implementing a settlement agreement establishing administrative closure for particular Guatemalan and

3

Salvadoran nationals); *id.* § 1245.15(p)(4)(i) (mandating administrative closure for specified Haitian nationals); *id.* § 1245.21(c) (permitting certain nationals of Vietnam, Cambodia, and Laos to move for administrative closure pending their applications for adjustment of status).

None, however, provided for administrative closure generally. So where did the IJ and BIA get the authority to close cases in all these *other* proceedings?

## C.     *Matter of Avetisyan* **and Expansion**

In 2012—almost three decades into this regime—the BIA offered its first answer. The trio of 1990s-era proceedings—*Matter of Munoz-Santos*, *Matter of Lopez-Barrios*, and *Matter of Gutierrez-Lopez*—all permitted administrative closure as a matter of "administrative convenience," but only when both parties supported the request. *See, e.g.*, *Matter of Gutierrez-Lopez*, 21 I. & N. Dec. at 480. Since the government typically opposed, this rule operated as a sort of veto power over closure requests. Troubled, the BIA in *Matter of Avetisyan* changed course, replacing the consensus requirement with a multifactor analysis. 25 I. & N. Dec. 688, 694–96 (B.I.A. 2012). And, importantly, it rested this authority on two regulations that, it suggested, confer broad authority to the IJs and BIA to manage their dockets: 8 C.F.R. § 1003.10(b) and 8 C.F.R. § 1003.1(d)(1). *See id.* at 691 (citing both).

The first, 8 C.F.R. § 1003.10(b), concerns the "powers and duties" of IJs, and states in relevant part:

> In deciding the individual cases before them, and subject to the applicable governing standards,

4

immigration judges shall exercise their independent judgment and discretion and *may take any action consistent with their authorities under the Act and regulations that is appropriate and necessary for the disposition of such cases*. . . . In all cases, immigration judges shall seek to resolve the questions before them in a timely and impartial manner consistent with the Act and regulations.

*Id.* (emphasis added).

The second, 8 C.F.R. § 1003.1(d)(1)(ii), which governs the powers of the BIA, allows "any action consistent with their authorities under the Act and the regulations as is appropriate and necessary for the disposition of the case." *Id.*

Neither regulation, though, provides for "administrative closure" anywhere in its text. No matter, the BIA concluded: "During the course of proceedings, an Immigration Judge or the Board may find it necessary or, in the interests of justice and fairness to the parties, prudent to defer further action for some period of time." *Matter of Avetisyan*, 25 I. & N. Dec. at 691. One option available to an IJ, the BIA acknowledged, "is a continuance." *Id.* As it so happens, continuances, unlike administrative closures, are expressly permitted "[p]ursuant to regulation." *Id.* at 691–92; *see* 8 C.F.R. § 1003.29. Even so, the BIA believed administrative closure could better facilitate "efficient[] management of the resources" of the immigration courts and the BIA. *Matter of Avetisyan*, 25 I. & N. Dec. at 695. A similar conclusion followed in *Matter of W-Y-U-*. 27 I. & N. Dec. 17 (B.I.A. 2017).

5

These decisions had immediate, practical effect: Administrative closures soared. Statistics maintained by the Executive Office of Immigration Review show that from 1980 to 2011, 283,366 cases were administratively closed (about 9,100 per year)—"[b]ut in a mere six years, from October 1, 2011 through September 30, 2017, immigration judges and the Board ordered administrative closure in 215,285 additional cases," or more than 35,000 per year. *Matter of Castro-Tum*, 27 I. & N. Dec. at 273; *see also Romero v. Barr*, 937 F.3d 282, 289 (4th Cir. 2019) (acknowledging that "as of October 2018, over 330,000 cases remained administratively closed").

**D.      The Attorney General Intervenes**

Eventually, the Attorney General stepped in. In 2014, the Department of Homeland Security ("DHS") commenced removal proceedings against Reynaldo Castro-Tum. *Matter of Castro-Tum*, 27 I. & N. Dec. at 279. The IJ sent five separate hearing notices summoning Castro-Tum to appear. *Id.* at 280. Each time, Castro-Tum did not. *Id.* DHS asked the IJ to proceed *in absentia*, but the IJ refused and instead, administratively closed the case (along with ten others) over its objection. *Id.* The government appealed, the BIA vacated the IJ's decision, and the Attorney General assumed responsibility under 8 C.F.R. § 1003.1(h)(1)(i). *Id.* at 280–81.

After reviewing the submissions,[2] regulations, history, and practice of administrative closure, the Attorney General

_____

[2] The Attorney General requested briefing from the parties and any interested amici on the scope of the IJ's, and BIA's, authority to order administrative closure. *Matter of Castro-Tum*, 27 I. & N. Dec. at 281. DHS and fourteen amici responded with arguments spanning over 500 pages. *Id.* at 282.

6

concluded that "immigration judges and the Board lack a general authority to grant administrative closure." *Id.* at 282. In so doing, the Attorney General overruled the BIA's contrary decisions in *Matter of Avetisyan* and *Matter of W-Y-U-. Id.* at 271. The parties and amici, the Attorney General observed, "agree that no statute or regulation explicitly delegates general administrative-closure authority." *Id.* at 284. But some amici, and the BIA in *Matter of Avetisyan*, inferred a delegation from 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii). *Id.* As the Attorney General explained, however, those regulations only grant IJs and the BIA the authority to take measures "appropriate and necessary" for the disposition of the cases. "Administrative closure," in contrast, was "the antithesis of a final disposition." *Id.* at 285. That made administrative closure permissible only when a regulation or judicially approved settlement agreement provides authorization. *Id.* at 271; *see also id.* at 272.[3]

---

[3] Since *Matter of Castro-Tum*, the courts of appeals have split on the propriety of the Attorney General's interpretation. *Compare Romero*, 937 F.3d at 292 ("[T]he plain language of 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii) unambiguously confers upon IJs and the BIA the general authority to administratively close cases . . . ."), *with Meza Morales v. Barr*, 973 F.3d 656, 667 (7th Cir. 2020) (stating that "*Castro-Tum*'s interpretive arguments fail to convince us that administrative closure is not plainly within an immigration judge's authority to take 'any action' that is 'appropriate and necessary for the disposition of . . . cases'" (quoting 8 C.F.R. § 1003.10(b))), *and Hernandez-Serrano*, 981 F.3d at 464 ("respectfully disagree[ing] . . . with the Fourth Circuit's conclusion in *Romero* that [8 C.F.R. §§ 1003.10(b) and

7

## II. Discussion

Against this backdrop, Arcos Sanchez asks for administrative closure to renew his application under the Deferred Action for Childhood Arrivals program. The BIA found that his claim was "squarely controlled by *Matter of Castro-Tum*." (A.R. at 4.) Arcos Sanchez and the majority respond that *Matter of Castro-Tum* should not control at all, because the Attorney General's reading of the pertinent federal regulations—namely 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)(ii)—is incorrect.

I agree with the majority that when interpretation becomes challenging, we do not "throw up our hands and let regulatory agencies do it for us." *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 707 (1991) (Scalia, J., dissenting); *see also Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (stating that "a court cannot wave the ambiguity flag just because it found the regulation impenetrable on first read"). But respectfully, after exhausting "all the traditional tools of construction," I do not agree that the majority's interpretation supplies the best ordinary understanding of these regulations. *Kisor*, 139 S. Ct. at 2415 (internal quotation marks omitted); *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 710–11 (3d Cir. 2020) ("[A]s with statutory interpretation, our review of a regulation centers on the ordinary meaning of the text.").

### A. Reading 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1)

IJs exercise only "the powers and duties delegated to them by the [Immigration and Nationality] Act and by the

1003.1(d)(1)(ii)] delegate broad authority to close cases administratively").

8

Attorney General through regulation." 8 C.F.R. § 1003.10(b). So too with members of the BIA, who "act as the Attorney General's delegates in the cases that come before them." *Id.* § 1003.1(a)(1). None argue that a statute or regulation explicitly grants IJs, or the BIA, a general power of administrative closure. *See, e.g.*, Maj. Op. at 7 (stating that "the INA and its regulations do not specifically reference general administrative closure authority"); *Meza Morales v. Barr*, 973 F.3d 656, 665 (7th Cir. 2020) (acknowledging that "no statute or regulation explicitly confers upon immigration judges a general power of administrative closure"). So the question is whether one does so impliedly.

Like the BIA in *Matter of Avetisyan*—which *Matter of Castro-Tum* overruled—the majority points to 8 C.F.R. §§ 1003.10(b) and 1003.1(d)(1). Section 1003.10(b) provides in relevant part: "In deciding the individual cases before them, and subject to the applicable governing standards, immigration judges shall exercise their independent judgment and discretion and may take any action consistent with their authorities under the Act and regulations that is appropriate and necessary for the disposition of such cases."[4]

Focusing on the phrases "any action" and "appropriate and necessary," the majority concludes that section 1003.10(b) "include[s] . . . actions such as administrative closure, which often facilitate . . . case resolution." Maj. Op. at 14 (quoting *Romero*, 937 F.3d at 292). That is because, the majority notes, "[i]n case after case, [courts] have given effect to th[e] expansive sense of 'any.'" *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1756 (2019) (Alito, J., dissenting). So too, it

---

[4] As explained earlier, the delegation to the BIA, at section 1003.1(d)(1)(ii), is nearly identical.

9

argues, with the phrase "appropriate and necessary," which is a "broad and all-encompassing term," *White Stallion Energy Ctr., LLC v. EPA*, 748 F.3d 1222, 1266 (D.C. Cir. 2014) (Kavanaugh, J., concurring in part and dissenting in part).

Fair enough. But those phrases, broad or not, are not best understood to render section 1003.10(b) without limitation and provide IJs nearly unfettered discretion. To the contrary, "appropriate and necessary" is itself an important restriction on the scope of the Attorney General's delegation, and one that comes with some bite. A point made in the same paragraph of the same opinion the majority cites. *See* Maj. Op. at 15 (citing *Michigan v. EPA*, 576 U.S. 743, 752 (2015)). As the *Michigan* Court explained, "[a]lthough th[e] term ["appropriate"] leaves agencies with flexibility," its discretion is not unlimited: "[A]n agency may not 'entirely fai[l] to consider an important aspect of the problem'" its regulations task it with solving. 576 U.S. at 752 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Appropriate and necessary" is thus "not a mere formality, but . . . a plainly expressed limitation." *Schlagenhauf v. Holder*, 379 U.S. 104, 118 (1964).

Nor is it true that "[n]othing in §§ 1003.10 or 1003.1(d)(1)(ii) suggests any limiting parameters on what may be considered 'appropriate and necessary.'" Maj. Op. at 15 n.5. Section 1003.10(b), after all, does not permit IJs to take "any action" so long as it is "appropriate and necessary." Rather, IJs may take "any action" that is "appropriate and necessary *for the disposition of*" "the individual cases before them." 8 C.F.R. § 1003.10(b) (emphasis added). This restriction is no mere gloss: "It is . . . a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 941 (2017)

10

(quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)); *see also* Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 148 (2012).

And there is meaning to this "disposition" requirement. The Attorney General's regulations do not define "disposition," but that is the usual occasion to reach for our "toolkit" containing "all the standard tools of interpretation" used to "carefully consider the text, structure, history, and purpose" of the regulation. *Kisor*, 139 S. Ct. at 2414–15 (internal quotation marks and alteration omitted). That allows us to "'reach a conclusion about the best interpretation,' thereby resolving any perceived ambiguity." *Shular v. United States*, 140 S. Ct. 779, 788 (2020) (Kavanaugh, J., concurring) (quoting *Kisor*, 139 S. Ct. at 2448 (Kavanaugh, J., concurring in the judgment)).

And the ordinary meaning of "disposition" is that of "[a] final settlement or determination." Black's Law Dictionary 505 (8th ed. 2004); *see also* Merriam-Webster's Collegiate Dictionary 361 (11th ed. 2005) ("final arrangement"); The American Heritage Dictionary 522 (4th ed. 2009) ("[a] final settlement").[5] Section 1003.10(b) is thus best understood to

---

[5] *See also* Daniel J. Oran, Oran's Dictionary of the Law 134 (1983) (defining a "disposition" as a final "settlement or result"); William C. Burton, Burton's Legal Thesaurus 187 (3d ed. 1998) (including as synonyms "conclusion, decision, . . . final settlement of a matter, finding, order, pronouncement, . . . resolution, settlement, [and] solution"); Black's Law Dictionary 484 (7th ed. 1999) ("[a] final settlement or determination"). The predecessor regulations read no differently. *See, e.g.*, Funk and Wagnall's Practical Standard

limit IJs to actions that are "appropriate and necessary" for the final resolution of the cases before them—not for actions merely facilitating the "efficient management of the resources of the immigration courts and the BIA." *Romero*, 937 F.3d at 289 (cleaned up). That follows the construction given the term by various courts in many contexts over several decades.[6] As the D.C. Circuit once put it: "After hearing argument, judges frequently tell the parties that they will advise them of the disposition of the matter. We expect that litigants, including the parties to this appeal, would be both surprised and puzzled if all we told them at the end of the day was that 'the case has been decided'—without telling them what that decision was." *Pub. Citizen, Inc. v. HHS*, 332 F.3d 654, 663 (D.C. Cir. 2003).

To be sure, we do not "construe the meaning of statutory terms in a vacuum," *Tyler v. Cain*, 533 U.S. 656, 662 (2001), but interpret the words of a statute or regulation "in

---

Dictionary of the English Language 752 (1955) (defining "to dispose" as "to arrange or settle matters finally").

[6] *See, e.g.*, *Lexon Ins. Co. v. Naser*, 781 F.3d 335, 338 (6th Cir. 2015) ("A disposition is 'a final settlement or determination.'" (quoting Black's Law Dictionary 572 (10th ed. 2014))); *United States v. Jarrell*, 147 F.3d 315, 317 n.2 (4th Cir. 1998) (writing that "[a] 'disposition' is '[t]he final settlement of a matter'" and it "does not encompass the ongoing effects of a ruling by the court" (quoting Black's Law Dictionary 326 (Abridged 6th ed. 1991))); *Ruggieri v. Warner & Swasey Co.*, 938 F.2d 322, 324 (1st Cir. 1991) ("The term 'disposition' connotes 'finality[.]'"); *Campbell Indus., Inc. v. Offshore Logistics Int'l, Inc.*, 816 F.2d 1401, 1404 (9th Cir. 1987) (stating that to "dispose of" a motion, a court must act in a way that "indicates an intention that the act be final").

12

their context and with a view to their place in the overall statutory scheme," *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). So we "extend[] our gaze from the narrow [regulatory] provision at issue to take in the larger [regulatory] landscape." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1722 (2017). That scheme confirms the ordinary understanding of "disposition" because sections 1003.10(b) and 1003.1(d)(1)(ii) delegate authority to take only actions that further the actual resolution of cases. After recognizing that IJs may take "appropriate and necessary" actions, for example, section 1003.10(b) concludes by directing IJs to "*resolve* the questions before them in a *timely* and impartial manner consistent with the [INA] and regulations." (emphases added). Section 1003.1(d)(1) provides the same. And 8 C.F.R. § 1003.12 advises that the governing regulations are to "assist in the *expeditious*, fair, and proper *resolution* of matters." (emphases added).

**B.    Administrative Closures Are Not "Dispositions" of Cases**

All this persuades me that section 1003.10(b) does not give IJs the authority to delay, perhaps forever, in deciding a case. For, as the majority agrees, "administrative closure" does not lead to resolution. *See* Maj. Op. at 7 ("'The administrative closing of a case does not result in a final order,' but 'is merely an administrative convenience which allows the removal of cases from the calendar in appropriate situations.'" (quoting *Matter of Amico*, 19 I. & N. Dec. at 654 n.1)). It is, rather, "the antithesis of [it]." *Matter of Castro-Tum*, 27 I. & N. Dec. at 285.

The mechanics of administrative closure itself make this clear. Once a case is administratively closed, it is "remove[d] .

. . from an Immigration Judge's active calendar." *Matter of Avetisyan*, 25 I. & N. Dec. at 692. The BIA has described this as "temporar[y]." *Id.* That seems overly optimistic: "Unless a party 'move[s] to recalendar [an administratively closed case] before the Immigration Court . . . or to reinstate the appeal before the Board,' the case remains indefinitely suspended without a final resolution." *Matter of Castro-Tum*, 27 I. & N. Dec. at 272–73 (quoting *Matter of Avetisyan*, 25 I. & N. Dec. at 692). The case disappears from the docket, the IJ no longer tracks it, and "the alien respondent in most cases has few incentives to seek to recalendar because 'as a general matter, every delay works to the advantage of the deportable alien who wishes merely to remain in the United States.'" *Id.* at 273 (quoting *INS v. Doherty*, 502 U.S. 314, 323 (1992)).

But we need not speculate. Since 1980, less than a third of cases administratively closed have even returned to the calendar. *Id.* Far from "disposing" of cases, administrative closure usually leads to no resolution at all. No doubt that is more "administrative[ly] convenien[t]" for the IJ and BIA. Maj. Op. at 6–7 (quoting *Matter of Gutierrez-Lopez*, 21 I. & N. Dec. at 480). But it is not an action encompassed within the Attorney General's delegation of authority in sections 1003.10(b) and 1003.1(d)(1)(ii).

## C. Nor Are Administrative Closures "Appropriate and Necessary" For Their Disposition

Arcos Sanchez and the majority take a different tack, reasoning that even if administrative closure does not itself "dispos[e]" of a case, it may be "appropriate and necessary" because it leads to the matter's "disposition." Respectfully, I am not persuaded.

Arcos Sanchez points to the facts of *Matter of Avetisyan*, which he argues prove how, counterintuitively, administrative closure can "expedite . . . a final disposition" of his, and others', cases. (Opening Br. at 18 (quoting *Romero*, 937 F.3d at 294 n.13).)[7] As he describes it, in *Matter of Avetisyan*, despite several continuances, the petitioner's "immigration file [was] shuttled back and forth between USCIS and the Office of Chief Counsel, which in turn prevented USCIS from completing its adjudication of her visa petition." (Opening Br. at 19.) Frustrated, the IJ administratively closed the petitioner's proceedings; this "provid[ed] USCIS an uninterrupted period to adjudicate the petition." (Opening Br. at 19.) Powerful evidence, it seems, that DHS should improve its intra-agency communications, perhaps at the direction of Congress. But too light a breeze to propel a vast delegation of general administrative closure authority.

The majority, in turn, maintains that administrative closure may be "appropriate and necessary" to halt removal proceedings while awaiting a decision from another adjudicatory body. As the majority puts it, "certain removal cases require resolution of questions that depend upon decisions from other tribunals or agencies over which neither the IJ nor the Board controls." Maj. Op. at 20. So, "[w]ithout the general authority to administratively close appropriate cases when necessary," it complains, "the IJs and the Board

---

[7] The majority agrees. *See* Maj. Op. at 16 ("We agree with *Romero* that 'administrative closure may—contrary to the Attorney General's argument in *Castro-Tum*—in fact facilitate the timely resolution of an issue or case.'" (citations omitted)).

15

may not have a sufficiently developed record and may be less effective in managing cases." Maj. Op. at 20.

This concern does not escape me; it would be "absurd indeed that [a petitioner] should be ordered removed because," for example, "the file needed for one DHS office to adjudicate his [or her] I-130 petition was being held by a different DHS office, which succeeded in removing [the petitioner] because the first DHS office had failed to adjudicate the petition." *Hashmi v. Att'y Gen.*, 531 F.3d 256, 261 (3d Cir. 2008). But thankfully, that is not the situation we, or Arcos Sanchez, face. Far from "fail[ing] to acknowledge the fact that allowing time for the IJ or the Board to receive the outcome from another tribunal or agency enables resolution of relevant questions," Maj. Op. at 20, the Attorney General has already given IJs a tool for managing these exact circumstances—where, "in the interests of justice and fairness to the parties, [it may be] prudent to defer further action for some period of time," *Matter of Avetisyan*, 25 I. & N. Dec. at 691. That tool, of course, is a continuance, and IJs may grant them "for good cause shown." 8 C.F.R. § 1003.29.[8] They are broadly available for petitioners seeking to pause removal proceedings to allow for resolution of other collateral ones that may bear on removability. *See, e.g.*, *Matter of Sanchez Sosa*, 25 I. & N. Dec. 807 (B.I.A. 2012) (U visas); *Matter of Rajah*, 25 I. & N. Dec. 127 (B.I.A. 2009) (employment-based visas); *Matter of Hashmi*, 24 I. & N. Dec. 785 (B.I.A. 2009) (family-based visas). The Attorney General

---

[8] Where appropriate, an IJ may also adjourn the proceedings: "After the commencement of the hearing, the immigration judge may grant a reasonable adjournment either at his or her own instance or, for good cause shown, upon application by the respondent or [DHS]." 8 C.F.R. § 1240.6.

16

recently reaffirmed as much. *Matter of L-A-B-R-*, 27 I. & N. Dec. 405, 419 (A.G. 2018).[9]

### III. CONCLUSION

Presumably, the scope of our decision today is limited. As the majority notes, DOJ issued a final rule largely resolving this interpretive dispute. Perhaps the arguments offered by Arcos Sanchez deserve closer attention by those charged with writing the law. But whatever the wisdom or folly of *Matter of Castro-Tum* as a matter of immigration policy, it is correct as a matter of interpretation. Administrative closure is a device only "created for the convenience of the Immigration Courts and the Board." *Matter of Avetisyan*, 25 I. & N. Dec. at 690. As it finds no footing in section 1003.10(b) and section 1003.1(d)(1)(ii), I respectfully dissent.

---

[9] Arcos Sanchez objects that continuances provide for only a "brief pause," "where the reason for the delay will be resolved quickly," while administrative closure "removes cases from an IJ's active docket until they are recalendared." (Reply Br. at 20.) Continuances, he complains, unlike administrative closure, thus "keep[] the case on the IJ's active calendar and require[] the parties to regularly report to the court after each short continued period, regardless of whether the collateral relief is resolved." (Reply Br. at 20 (citation omitted).) All true, and a good reason to favor the accountability provided by continuances.